[989 NYS2d 826]

Kenny Kramer et al., Plaintiffs, v Skyhorse Publishing, Inc., et al., Defendants.

Supreme Court, New York County, July 14, 2014

### APPEARANCES OF COUNSEL

*Fish & Richardson, P.C.*, New York City (*Kristen McCallion* and *John T. Johnson* of counsel), for Skyhorse Publishing, Inc., defendant.

*Smith Dehn LLP*, New York City (*Francis X. Dehn* of counsel), *David Albert Pierce*, of the California bar, admitted pro hac vice, and *Azita Mirzaian*, of the California bar, admitted pro hac vice, for Fred Stoller, defendant.

*Law Office of Fred Lichtmacher, P.C.*, New York City (*Fred Lichtmacher* of counsel), for plaintiffs.

### OPINION OF THE COURT

BARBARA JAFFE, J.

Defendants move pursuant to CPLR 3211 (a) (7) for an order dismissing plaintiffs' complaint in its entirety. Plaintiffs oppose.

## I. Parties

Plaintiff Kenny Kramer, known by television fans as the inspiration for the eccentric character Cosmo Kramer on the popular 1990s television situation comedy series, *Seinfeld*, is the principal agent of plaintiff Kramer's Reality Tours, Inc., which provides bus tours of New York City locations portrayed in the show (NY St Cts Electronic Filing [NYSCEF] Doc. No. 1, https://iapps.courts.state.ny.us/nyscef/CaseSearch [complete CAPTCHA, search by case index No. 161919/2013, click on index No. hyperlink]). Defendant Stoller is a comedian and former

*Seinfeld* staff writer who appeared several times as a guest star on the series. (NYSCEF Doc. No. 9.) Defendant Skyhorse Publishing, Inc., located in Manhattan, published a memoir authored by Stoller entitled, Maybe We'll Have You Back: The Life of a Perennial TV Guest Star. (NYSCEF Doc. No. 1.)

## II. Factual Background

### A. "The Outing"

Plaintiffs' claims ultimately arise from a particular episode of the *Seinfeld* show, a "fictional comedic presentation" (*Costanza v Seinfeld*, 181 Misc 2d 562, 566 [Sup Ct, NY County 1999], *affd as mod* 279 AD2d 255 [1st Dept 2001]), co-written and co-created by Jerry Seinfeld, a comedian who is well-known for his observational humor (*see* Wikipedia, *Jerry Seinfeld*, http://en.wikipedia.org/wiki/Jerry_Seinfeld). The series was based in New York City, which is well-known for the liberal values of its population. (*See* Ginia Bellafante, *Exposing the Hypocrisies of the New York Liberal*, NY Times, May 2, 2014, available at http://www.nytimes.com/2014/05/04/nyregion/exposing-the-hypocrisies-of-the-new-york-liberal.html [referencing the "primacy" of New York City's "liberal values"].)

The episode, entitled "The Outing," aired on February 11, 1993 (*see* IMDb, *Seinfeld: Season 4, Episode 17: The Outing*, http://www.imdb.com/title/tt0697745/). In it, Jerry, the heterosexual main character, and George, his heterosexual friend, are outed as a gay couple by a student journalist who was interviewing them for a New York University newspaper. After Jerry and George "strenuously deny" being gay, they add, "Not that there's anything wrong with that." (Wikipedia, *The Outing*, http://en.wikipedia.org/wiki/The_Outing [last updated July 4, 2014].)

### B. Kramer's Reality

In chapter 22 of his memoir, entitled *Kramer's Reality* and published on April 1, 2013, Stoller describes his 1996 experience on the Reality Tour, which he took at Kramer's instance. According to Stoller, plaintiffs' employee "ran around the crowded bus for over two hours, trying to keep the tourists excited by screaming out famous lines from *Seinfeld*." (NYSCEF Doc. No. 8, exhibit B.) He recounts the employee crying out to the tourists, "Everyone, say it together, 'No soup for you!'" a popular *Seinfeld* catchphrase, and continues as follows:

> "Then [the employee would] point to a bum and say, 'Everyone, he is picking his nose. Or as Jerry

would say, 'The Pick! The Pick!'

"[The employee] had a slight lisp which caused him to spit on me when he led the crowd in a hearty chant of, 'Hell-oooo Newman!'

"In spite of my distaste for the whole thing, Kramer prodded me to sit on the tour again. For the second day in a row, I had to hear [the employee] scream out all of the catch phrases by all of the same places. I'm sure the tourists were wondering why the *Seinfeld* special guest star was covering his ears.

"I just shook my head, amazed that a show as brilliant as *Seinfeld* could be so lamed down. In the gay-dominated Greenwich Village, I had to hear [the employee] make everyone scream out, 'Not that there's anything wrong with that!' Once wasn't embarrassing enough, so he'd scream it out again like some sort of deranged cheerleader, 'Not that there's anything wrong with that!'

"Many of the bus riders had seen me on the show and seemed excited that I was on the tour. I was happy to tell them some of my stories before getting on the bus, but once the tour started, I just couldn't hide the pain I was in. I rode with my hands pressed hard against the side of my head to drown out Kramer and [the employee's] shtick." (*Id.*)

### III. Procedural Background

On or about December 30, 2013, plaintiffs commenced this action advancing causes of action for defamation, defamation per se, and intentional interference with business relations. They allege, in paragraph 7 of the complaint, that Stoller's book was published by Skyhorse on April 1, 2013, and in paragraph 13, that defendants' "false and malicious statements injured [their] reputations and their professional standing, not only in their community, but in every venue where the book is published." (NYSCEF Doc. No. 1 ¶ 13.) They seek $1 million in damages, plus punitive damages. (NYSCEF Doc. No. 1.)

Specifically, they allege as follows:

"8. The book contained statements which describes [sic] Defendant STOLLER's experiences with Plaintiff REALITY TOURS.

"9. STOLLER states that while on a tour with REALITY TOURS, in Greenwich Village, STOLLER . . . heard one of the employees of REALITY

TOURS scream out 'Not that there's anything wrong with that' on more than one occasion, a direct reference to a line used on the Seinfeld show, referring to members of the gay community. In fact, Plaintiff REALITY TOURS does not travel through Greenwich Village nor did Plaintiffs or its employees ever make such statements." (NYSCEF Doc. No. 1 ¶¶ 8, 9.)

Plaintiffs maintain that in this chapter, Stoller thereby "falsely accus[es them] of taunting persons from the gay community," and that defendants thereby damage Kramer's reputation in the gay community, negatively affecting his career as an entertainer and causing him emotional harm, and intentionally damage Reality Tours' business reputation, frustrating its ability to attract customers, and resulting in lost income. (*Id.* ¶ 10.)

## IV. Contentions

Defendants contend that plaintiffs fail to plead defamation with sufficient particularity and do not allege the pecuniary losses suffered, and that, in any event, they lack standing, as the allegedly defamatory statement attributes the conduct on the bus to a Reality Tours employee, not to plaintiffs. They deny any defamatory meaning, and maintain that the alleged defamatory meaning arises solely from an artificial and strained reading of the statement, and observe that the *Seinfeld* catchphrase, "Not that there's anything wrong with that" used on the Reality Tour is "instantly recognizable to *Seinfeld* fans as a comical commentary on political correctness, changing sexual mores, and the First Amendment." (NYSCEF Doc. No. 9 at 9.) They also deny that the statement constitutes defamation per se, as it is neither incompatible with plaintiffs' trade or business nor does it reference a matter of significance or importance to the tourism industry. Defendants also argue that as Kramer has attained the status of a public figure, plaintiffs fail to plead facts demonstrating that the statement was made with knowledge of its falsity or with reckless disregard of it, and maintain that plaintiffs' business interference claim fails absent any allegation of the existence of a valid contract. (NYSCEF Doc. Nos. 9, 20.)

In opposition, plaintiffs argue that the statement, as set forth in paragraph 9 of the complaint, is sufficiently particular, and observe that the particulars of its making are sufficiently set forth. They assert that the statement falsely accuses them of "taunting members of the gay community" which "impl[ies

that they] may be hostile to gay people." (NYSCEF Doc. No. 23 at 4, 7.) As a result, plaintiffs claim that they have been exposed to "public contempt, hatred, ridicule, aversion or disgrace," which is incompatible with their business. (NYSCEF Doc. No. 23 at 4.) They also maintain that they have pleaded that defendants acted maliciously by making the false statements, and that their status as public figures is irrelevant at the pleading stage, and contend that their business interference claim has merit given their contractual relationships with their customers. (*Id.* at 5-8.)

In reply, defendants observe that nowhere in the statement is it written that the tour employee taunted anyone on the street, and argue that plaintiffs fail to rebut their showing that Kramer has no standing, and do not deny that he is a public figure. (NYSCEF Doc. Nos. 29, 33.)

### V. Discussion

Pursuant to CPLR 3211 (a) (7), a party may move for an order dismissing a cause of action against it on the ground that the pleading fails to state a cause of action. In deciding the motion, the court must liberally construe the pleading, accept all of the alleged facts as true, and accord the non-movant every possible favorable inference, ascertaining only whether the allegations fall within any cognizable legal theory. (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994].)

### A. Particularity

In an action for libel, "the particular words complained of shall be set forth in the complaint" (CPLR 3016 [a]). The statute was enacted to ensure that defendants are adequately notified of the alleged defamatory statement and to discourage actions intended solely to harass. (5 Carmody-Wait 2d § 29:255; *Pappalardo v Westchester Rockland Newspapers*, 101 AD2d 830, 831 [2d Dept 1984], *affd* 64 NY2d 862 [1985].) The statutory requirement is "strictly enforced" (*Laiken v American Bank & Trust Co.*, 34 AD2d 514, 514 [1st Dept 1970]; *Gardner v Alexander Rent-A-Car*, 28 AD2d 667, 667 [1st Dept 1967]), and where the allegedly defamatory words are "only paraphrased in a manner such that the actual words [are] not evident from the face of the complaint, the long-standing rule is that dismissal is required." (*Mañas v VMS Assoc., LLC*, 53 AD3d 451, 454-455 [1st Dept 2008]; *Murganti v Weber*, 248 AD2d 208, 208-209 [1st Dept 1998] [citations omitted].) From the foregoing, it is logically inferred that dismissal may not be required where the al-

leged defamatory words are evident from the face of the complaint and afford sufficient notice of the claim. (*Cf. Mañas*, 53 AD3d at 454-455; *Murganti*, 248 AD2d at 208-209.)

Here, although plaintiffs paraphrase Stoller's allegedly defamatory statement, they quote the *Seinfeld* catchphrase referenced therein, "Not that there's anything wrong with that," and omit nothing material. I thus find that as the allegedly defamatory words are evident from the face of the complaint and as defendants are thereby notified of them, the complaint is sufficiently particular. (*Cf. Mañas*, 53 AD3d at 454-455; *Murganti*, 248 AD2d at 208-209.) In any event, defendants annex the entire chapter to their papers.

The complaint must also set forth "the time, place and manner of publication" (*Khan v Duane Reade*, 7 AD3d 311, 312 [1st Dept 2004]), and "specify to whom it was made" (*Dillon v City of New York*, 261 AD2d 34, 38 [1st Dept 1999]). Having alleged that the statement was published on April 1, 2013 for readers in "every venue where the book is published," the time, place, manner, and audience are sufficiently specified. (NYSCEF Doc. No. 1 ¶ 13.)

## B. Defamation

A defamatory statement is "a false statement that tends to expose [the plaintiff] to public contempt, hatred, ridicule, aversion or disgrace." (*Thomas H. v Paul B.*, 18 NY3d 580, 584 [2012].) To sustain a claim for defamation, the plaintiff must plead: (1) a false statement, and (2) publication to a third party (3) absent privilege or authorization, which (4) causes harm, unless the statement is defamatory per se, in which case harm is presumed (*Stepanov v Dow Jones & Co., Inc.*, 120 AD3d 28 [1st Dept 2014]).

### 1. "Of and Concerning" Plaintiffs

The plaintiff must also show that "the reading public acquainted with the parties and the subject" would have understood the statement to be "of and concerning" him. (*Carlucci v Poughkeepsie Newspapers*, 57 NY2d 883, 885 [1982].) While the statement need not specifically identify the plaintiff to be actionable, the plaintiff has a heavy burden, even at the pleading stage, of establishing that the statement was actually about him. (*See Lihong Dong v Ming Hai*, 108 AD3d 599 [2d Dept 2013].)

That plaintiffs' employee and not Kramer is engaged in the conduct described in the statement is of no moment, absent

any factual basis alleged for concluding that the employee was not apparently authorized to engage the tourists with *Seinfeld*-related entertainment. (*See American Soc. of Mechanical Engineers, Inc. v Hydrolevel Corp.*, 456 US 556, 565-566 [1982] [under general rules of agency law, principals are liable when their agents act with apparent authority].)

It is also undisputed that in the book, Stoller describes events that occurred during a bus tour conducted by plaintiff Kramer's eponymously-named tour bus company. A closer public association between an individual and an entity can scarcely be imagined. Moreover, as plaintiffs allege in the complaint that Stoller falsely accuses Reality Tours and Kramer, they sufficiently demonstrate that the statement is about them. (*Compare Prince v Fox Tel. Stas., Inc.*, 93 AD3d 614 [1st Dept 2012] [affirming denial of defendants' motion to dismiss defamation claim, in which motion court found that news broadcast was of and concerning plaintiff, even though, on its face, broadcast referred to different entity with similar name, as statement reasonably understood to be about plaintiff], *and Cuthbert v National Org. For Women*, 207 AD2d 624, 625-626 [3d Dept 1994] [statement referring to person easily identified as plaintiff actionable], *with Carlucci* [article stating that owner of plaintiff grocery store was arrested on gambling charges was not "of and concerning" plaintiff as corporation cannot be arrested].) Thus, plaintiffs have standing. (*Cf. Afftrex, Ltd. v General Elec. Co.*, 161 AD2d 855 [3d Dept 1990] [as defamatory statement reflected directly on plaintiff president of company and not on plaintiff company, plaintiff company lacked standing to bring action for defamation].)

2. Defamatory Meaning

Whether a statement is defamatory constitutes "a legal question to be resolved by the court in the first instance." (*Golub v Enquirer/Star Group*, 89 NY2d 1074, 1076 [1997]; *Armstrong v Simon & Schuster*, 85 NY2d 373, 380 [1995]; *Aronson v Wiersma*, 65 NY2d 592, 593 [1985]; *James v Gannett Co.*, 40 NY2d 415, 419 [1976].) In determining whether a statement is defamatory,

> "[t]he words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction

. . . ." (*Aronson,* 65 NY2d at 594; *Armstrong,* 85 NY2d at 380; *James,* 40 NY2d at 419-420.)

If the statement is reasonably susceptible of a defamatory connotation, then it is for the jury to determine "whether that was the sense in which the words were likely to be understood by the ordinary and average reader." (*James,* 40 NY2d at 419; *Mencher v Chesley,* 297 NY 94, 100 [1947] [court may not determine sole meaning of words, only whether reasonable basis exists for defamatory interpretation].)

To determine whether Stoller's statement in the book is reasonably susceptible of being interpreted as a depiction of plaintiffs taunting members of the gay community, plaintiffs' employee's conduct must be reasonably susceptible of being antigay, or homophobic. And, as the defamatory content of the statement depends in large part on the *Seinfeld* episode and catchphrase, "Not that there's anything wrong with that," so too must the phrase be reasonably susceptible of a homophobic meaning. On its face, the phrase expressly conveys the notion that there is nothing wrong with being gay. In that respect, it cannot be considered homophobic. That the phrase is not expressly homophobic, however, does not mean that it is not reasonably susceptible of a homophobic meaning. In other words, is there really anything wrong with it?

To discern whether the phrase is reasonably susceptible of being anti-homosexual, homophobic, or antigay, and absent any attempt by the parties to analyze the phrase in depth, I begin with the context in which the phrase originates. In "The Outing," the *Seinfeld* writers engaged in satire, "employ[ing] irony, derision, or wit" (*Salomone v Macmillan Publ. Co.,* 97 Misc 2d 346, 350 [Sup Ct, NY County 1978] [internal quotation marks omitted], quoting American Heritage Dictionary [New College ed 1976]), to ridicule (*Blanch v Koons,* 467 F3d 244, 255 [2d Cir 2006], quoting Oxford English Dictionary 500 [14th ed]) Jerry and George who, while fearful of appearing gay, also fear appearing antigay. In that context, the catchphrase speaks to the ambivalence a heterosexual male may feel about homosexuality, and says little, if anything, about homosexuality. (*See* Eric Metaxas, *Not That There's Anything Wrong With That,* Break-Point Commentaries, June 7, 2013, http://www.breakpoint.org/bpcommentaries/entry/ 13/22436; Gerald P. Delahunty, *A Relevance Theoretic Analysis of Not That Sentences: "Not That There is Anything Wrong With That",* 16 Pragmatics [Nos. 2, 3], 213-245 [2006], available at http://elanguage.net/journals/

pragmatics/article/view/513/433]; tvtropes, *Not That There's Anything Wrong With That*, http://tvtropes.org/pmwiki/pmwiki.php/Main/NotThatTheresAnythingWrongwithThat ["The subtext (of the catch phrase) tends to be 'I'm a homophobe, but I don't want to be one' "].)

In fact, the episode has been credited with "help[ing] raise awareness of LGBT issues—and expos[ing] the toxicity of bigotry toward the gay and lesbian community" (Jonathan Miller, *'Not That There's Anything Wrong With That': The 20th Anniversary of When the Show 'About Nothing' Really Mattered*, HuffPost TV [Apr. 1, 2013], http://www.huffingtonpost.com/jonathanmiller/*seinfeld-the-outing_b_2989098.html*). Rolling Stone quotes Stephan Tropiano, author of The Prime Time Closet, who observed that, "in a way, [the episode] becomes a wry, self-reflexive commentary on television's uncertain treatment of homosexuality." (*Close Talkers and Double Dippers: 15 Phrases Seinfeld Spawned*, Rolling Stone [July 2, 2014], http://www.rollingstone.com/tv/pictures/close-talkers-and-double-dippers-15-phrases-seinfeld-spawned-20140702#.) In addition, the episode won a Gay and Lesbian Alliance Against Defamation Media Award. (*Id.*)

Even if the catchphrase were reasonably susceptible of a homophobic meaning, it must nonetheless be determined whether Stoller's depiction of the Reality Tour, when read by the average reader and construed in the context of the entire chapter, is reasonably susceptible of a homophobic meaning. Stoller recounts that plaintiffs' employee, while leading a Reality Tour, screams to the tourists on the bus several catchphrases from the show, extolling them to join him in reciting the phrases.

In contrast to the subtlety of the satirical *Seinfeld* episode, Stoller's description of the Reality Tour reveals it as a parody of it. (*See Salomone*, 97 Misc 2d at 350 [parody "shuns subtlety" and seeks "to amuse and expose by imitating life, but larger than life. Its essence is distortion and exaggeration"].) The employee distorts and exaggerates the original use of the phrase, and Stoller himself characterizes it as "shtick." Although Stoller finds the exercise annoying, any reasonable reader would understand it as *Seinfeld*-related shtick, even if the phrase was repeatedly screamed out as the bus wended its way through "gay-dominated Greenwich Village." And, although pointing to gay people and taunting them with the phrase from within a large tour bus wending its way down tiny streets in Greenwich Village may reasonably reflect homophobia, nowhere does

Stoller depict any pointing and he never uses the term "taunting."

In any event, that some readers may nonetheless infer from Stoller's statement that plaintiffs are homophobic does not render the inference reasonable under the circumstances (*see e.g. Ava v NYP Holdings, Inc.*, 64 AD3d 407, 414 [2009] [average reader would not reasonably infer that one with lewd fantasy is sexually promiscuous]), and in opposing this motion, plaintiffs do not explain how, given its context, Stoller's statement constitutes an accusation that they were taunting gay persons.

And, as "[d]efamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements" (*Stepanov v Dow Jones & Co., Inc.*, 120 AD3d at 35 [1st Dept 2014], quoting *Armstrong*, 85 NY2d at 380-381), and given plaintiffs' position that Stoller's description of the bus tour is false, they advance no claim of defamation by implication. Thus, it need not be addressed.

3. Damages and Actual Malice

As the statement is not defamatory, I need not address whether plaintiffs sufficiently plead damages or actual malice. (*See Cutler v Ensage, Inc.*, 18 Misc 3d 1101[A], 2007 NY Slip Op 52373[U], *9 [Sup Ct, NY County 2007] [court declined to reach issue of whether plaintiff adequately alleged special damages or whether common interest privilege was applicable given dismissal of cause of action for defamation].)

In any event, plaintiffs fail to plead special damages. (*See Drug Research Corp. v Curtis Publ. Co.*, 7 NY2d 435, 440-441 [1960] [damages alleged in round figures with no attempt at itemization deemed representation of general damages]; *Akpinar v Moran*, 83 AD3d 458, 459 [1st Dept 2011], *lv denied* 17 NY3d 707 [2011] [allegation of loss of $17 million in venture funding from unspecified individuals insufficient]; *Larson v Albany Med. Ctr.*, 252 AD2d 936, 939 [3d Dept 1998] [failure to itemize damages in pleading deemed representation of general damages; mere allegations of lost income insufficient]; *Talbot v Johnson Newspaper Corp.*, 124 AD2d 284, 286-287 [3d Dept 1986] [plaintiffs' burden to identify actual losses; particularization of harm to reputation and occupation insufficient].)

Given Kramer's undisputed status as a public figure, plaintiffs also fail to allege that defendants published Stoller's statement

with actual malice, with knowledge of its falsity, or with reckless disregard for its truth. That the statement is alleged to be false does not constitute an allegation that defendants knew it to be false.

## C. Defamation Per Se

A statement that "tend[s] to injure" the plaintiff in her trade or business is defamatory per se. (*Liberman v Gelstein*, 80 NY2d 429, 435 [1992]; *see also Matter of Konig v WordPress.com*, 112 AD3d 936, 937 [2d Dept 2013].) To be actionable, the statement must charge the plaintiff with qualities "incompatible with the proper conduct of the business, trade, profession or office itself." (*Liberman*, 80 NY2d at 436.)

Given the intentional association between the tour and the satirical comedy show, the eccentric persona of the Kramer character on the show, and the analysis of the *Seinfeld* catchphrase set forth above (V.B.2.), under any analysis, plaintiffs have not sufficiently alleged that defendants' depiction, even if false, of the employee's conduct is incompatible with the proper conduct of plaintiffs' business. Consequently, plaintiffs fail to plead sufficiently a cause of action for defamation per se.

## D. Tortious Interference with Business Relations

A plaintiff asserting a tortious interference with business relations must demonstrate: (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) that the defendant intentionally and improperly procured a breach, and (4) damages. (*White Plains Coat & Apron Co., Inc. v Cintas Corp.*, 8 NY3d 422, 426 [2007].) A prospective business relationship, in contrast to an existing contract, constitutes a "speculative interest" that is less protected than an existing contract. (*Id.* at 425-426; *Guard-Life Corp. v Parker Hardware Mfg. Corp.*, 50 NY2d 183, 191 [1980].) Consequently, liability may be imposed for tortious interference with a prospective business relationship upon a demonstration that the defendant's conduct amounted to "a crime or an independent tort" (*Carvel Corp. v Noonan*, 3 NY3d 182, 190 [2004]), or that the defendant engaged in conduct "for the sole purpose of inflicting intentional harm on plaintiffs" (*id.* at 190, quoting *NBT Bancorp v Fleet/Norstar Fin. Group*, 215 AD2d 990, 990 [3d Dept 1995], *affd* 87 NY2d 614 [1996]), or that the defendant employed wrongful means such as "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions" (*NBT Bancorp Inc.*, 87 NY2d at 624; *Guard-Life*, 50 NY2d at 191).

Absent any allegation that customers actually breached contracts as a result of having read Stoller's description of the

Reality Tour, the interest plaintiffs seek to protect is speculative. As plaintiffs allege that Stoller's statement is false, they, in effect, plead that defendants misrepresent the Reality Tour, and they also allege that defendants do so with the specific intent to dissuade potential customers from buying tickets for the tour. However, as plaintiffs premise this cause of action solely on the alleged defamatory content of defendants' statement, and in light of the insufficiency of their allegations in that regard (*supra*, V.B.2.; C.), they insufficiently plead a cause of action for tortious interference with business relations.

## VI. Conclusion

Accordingly, it is hereby ordered, that defendants' motion to dismiss the complaint is granted in its entirety.