[21 NYS3d 6]

JOHN RASHAD FRANKLIN, Also Known as DJ RASHAD HAYES, Respondent, v THE DAILY HOLDINGS, INC., et al., Appellants.

First Department, November 12, 2015

**APPEARANCES OF COUNSEL**

*Davis Wright Tremaine LLP*, New York City (*Laura R. Handman* and *Deborah A. Adler* of counsel), for appellants.

*McLaughlin & Stern LLP*, New York City (*Neil B. Solomon* of counsel), for respondent.

**OPINION OF THE COURT**

KAPNICK, J.

This action arises from an Internet news article alleged to be defamatory. Plaintiff is a DJ who, in 2012, occasionally worked at the downtown Manhattan nightclub WIP. Defendant, The Daily Holdings, Inc. "TDH" formerly known as News DP Holdings (the Daily), operated an iPad-only subscription based newspaper from 2010 to December of 2012. The Daily was a wholly owned subsidiary of defendant News Corporation (News Corp.).

On or about June 13, 2012, rappers Chris Brown and Drake and their entourages were allegedly involved in a fight at WIP over Brown's ex-girlfriend, singer Rihanna. According to plaintiff, two friends of his, identified by their Twitter handles as @BiggDoobs and @dj_trustory, who knew that he DJ'ed at WIP, tweeted him about the fight. In response, plaintiff posted

to his Twitter account, "I was gonna start shooting in the air but I decided against it. Too much violence in the hip hop community." Plaintiff had 800 Twitter followers and his account was public.

On June 15, 2012, the Daily posted a news article about the altercation, titled "Ri-Ri's Rumble," which included the following statements:

> " 'So we're sitting in there. Me, a couple of others, Chris,' eyewitness DJ Rashad Hayes said. 'Drake comes in and keeps eyeballing the table.'

> "Perhaps to show he didn't care that Drake had hooked up with his ex—or to flaunt the fact that he's rekindled his romance with her—Brown sent a bottle to Drake's table. Drake sent it back with a note, a witness told the New York Post. It read, 'I'm f. . .ing the love of your life [Rihanna], deal with it.'

> "And then things erupted. As rappers Maino and Meek Mill looked on, Brown and Drake's entourages threw bottles and fists throughout the club. 'I was gonna start shooting in the air but I decided against it,' Hayes said." (Emphasis omitted.)

According to plaintiff, he posted a demand for a retraction in the comments section of the article and on the Daily's "Contact the Daily" section of its site.

By summons and verified complaint dated February 14, 2014, plaintiff alleges that defendants, in publishing "Ri-Ri's Rumble," defamed him. Specifically, plaintiff alleges that defendants falsely identified him as a witness who made the statement: "So we're sitting in there. Me, a couple of others, Chris . . . Drake comes in and keeps eyeballing the table," when he never made any such statement to anyone. Plaintiff further alleges that the article implied that he had stated, "I was gonna start shooting in the air but I decided against it" to a reporter in seriousness, when that statement was only a tweet he made in jest. Further, plaintiff alleges that he was not at WIP on the night of the fight and that by failing to publish his full tweet, the Daily changed it from one eschewing violence, to one that made it look as if plaintiff were a "gun-toting psychopath with an itchy trigger finger."

Plaintiff alleges that his career was on a sharp trajectory upward, and that he was on the cusp of breaking out as a

prominent national and New York City DJ, but the article devastated his career. According to plaintiff, he was banned from WIP immediately after the article was published, and negotiations for various career opportunities ended. The complaint contains two causes of action—libel and libel per se.

By notice of motion dated March 6, 2014, defendants moved pursuant to CPLR 3211 (a) (7) for dismissal of the complaint. Defendants argued that the published statements are not capable, as a matter of law, of a defamatory meaning. Defendants also argued that plaintiff admitted in his complaint to posting the relevant tweet, rendering it nonactionable and the entire article substantially true. Lastly, defendant News Corp. argued that it could not be liable, since there was no claim that it had any involvement in the publication of the article, nor did plaintiff plead facts sufficient to create parent/subsidiary liability.

Plaintiff argued in opposition that the Daily's misidentification of him as an eyewitness, its creation of a fabricated quote confirming that misidentification, and its publishing the tweet out of context, created the reasonable conclusion that plaintiff carried a loaded gun, intending to shoot it in a crowded club where he worked, and imputed characteristics to him incompatible with his being a DJ. Further, plaintiff argued that the article gave the false impression that he would speak with the press about the goings-on at trendy clubs and private parties, attended by celebrities and wealthy professionals, where he works. Regarding substantial truth, plaintiff argued that it is an affirmative defense to be raised in an answer, and thus an inappropriate basis for a motion to dismiss.

As to News Corp., plaintiff argued that he was not alleging liability merely because it was the parent corporation of the Daily, but because the Daily was the alter ego and/or agent of News Corp. Specifically, plaintiff argued that News Corp. CEO Rupert Murdoch was the creator of the Daily and took the stage at the Daily's launch party. Plaintiff further alleged that News Corp. spent $30 million to launch the Daily, News Corp. sent the invitations to the launch party, and News Corp.'s spokesman was quoted with respect to a lawsuit over the rights to the name "the Daily."

By order dated May 14, 2014, the motion court denied defendants' motion, noting that it must accept plaintiff's allegations in the complaint as true, and finding that "plaintiff's complaint [wa]s pled with sufficient specificity to form cogni-

zant causes of action." The court did not specifically address defendants' claims of substantial truth, or News Corp.'s claim that it could not be held liable as the mere parent corporation of the Daily.

## Discussion

"Defamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society" (*Stepanov v Dow Jones & Co., Inc.*, 120 AD3d 28, 34 [1st Dept 2014] [internal quotation marks omitted]).

> "To create liability for defamation there must be: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication" (Restatement [Second] of Torts § 558).

Alleged Defamatory Statements

There are two allegedly defamatory statements within the article. The first, which plaintiff maintains is a fabricated quotation, is, " 'So we're sitting in there. Me, a couple of others, Chris,' eyewitness DJ Rashad Hayes said. 'Drake comes in and keeps eyeballing the table' " (emphasis omitted). The second statement, which is partially quoted from plaintiff's Twitter feed, is as follows: "And then things erupted. As rappers Maino and Meek Mill looked on, Brown and Drake's entourages threw bottles and fists throughout the club.[1] 'I was gonna start shooting in the air but I decided against it,' Hayes said" (emphasis omitted).

---

**1.** We note that although these alleged fabricated quotations are not actionable here due to a failure to plead special damages (*see infra* at 92-93), "[a]n inaccurate quotation may constitute a libel of the person purportedly being quoted in two ways: by attributing to the plaintiff a statement that he or she should not have made, or by placing in the plaintiff's mouth a false and defamatory statement about him- or herself" (1 Robert D. Sack, Sack on Defamation § 2:4.12 at 2-62 [4th ed 2015], citing *Masson v New Yorker Mag., Inc.*, 501 US 496, 511-512 [1991]; *see also Ben-Oliel v Press Publ. Co.*, 251 NY 250, 255 [1929] ["In order to constitute a libel, it is not necessary for the defendant in its paper to directly attack the plaintiff as an ignorant imposter. The same result is accomplished by putting in her mouth or attaching to her pen words which make self-revelation of such a fact"]).

The parties largely focus on whether or not the statements are capable of a defamatory meaning and whether the second statement meets the falsity requirement, given that the Daily used words that were originally published via plaintiff's public Twitter account.

"[A] threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it" (*Agnant v Shakur*, 30 F Supp 2d 420, 423-424 [SD NY 1998] [applying New York law] [internal quotation marks omitted]). "The court's threshold inquiry is guided by both the meaning of the words as they would commonly be understood and the context in which they appear" (*id.* at 424).

■ With respect to the first alleged defamatory statement (" 'So we're sitting in there. Me, a couple of others, Chris,' eye-witness DJ Rashad Hayes said. 'Drake comes in and keeps eyeballing the table' " [emphasis omitted]) and the allegedly fabricated portion of the second statement ("And then things erupted. As rappers Maino and Meek Mill looked on, Brown and Drake's entourages threw bottles and fists throughout the club" [emphasis omitted]), neither the language, nor the implication that plaintiff was a witness to the incident, are libelous on their face, meaning that the complained of words are not commonly understood to subject a person to public contempt or ridicule. Stated another way, the import of this statement is innocent on its face since it merely conveys that plaintiff was sitting at a table observing his surroundings; even if false, this statement is not defamatory. The only way plaintiff alleges that these statements are susceptible to a defamatory meaning is by reference to extrinsic facts. No reasonable juror could interpret the alleged defamatory statements in the manner urged by plaintiff without knowing that employers expect DJs not to publicly discuss or give interviews about the happenings at trendy clubs and private parties where they work (*see e.g. Agnant*, 30 F Supp 2d at 426). The need for extrinsic facts to render the statement defamatory conclusively dictates that it cannot be libel per se (second cause of action) (*id.* ["It is well established in New York . . . that statements cannot be libelous *per se* 'if reference to extrinsic facts is necessary to give them a defamatory import' "], quoting *Aronson v Wiersma*, 65 NY2d 592, 594-595 [1985]).

To make out his first cause of action for libel based on the first allegedly defamatory statement and the allegedly fabri-

cated portion of the second statement, plaintiff is required to plead special damages (*Agnant*, 30 F Supp 2d at 426; *see also Rall v Hellman*, 284 AD2d 113, 114 [1st Dept 2001]). "Special damages consist of the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not from the effects of the defamation" (*Agnant*, 30 F Supp 2d at 426 [internal quotation marks omitted]; *see also Drug Research Corp. v Curtis Publ. Co.*, 7 NY2d 435, 440-441 [1960] [holding that allegations of special damage must be "fully and accurately stated" and round figures, with no attempt at itemization, do not state special damages]). Here, although plaintiff states the ways in which he believes his career was damaged as a result of the article, he fails to state more than a round figure of $3,000,000 when alleging his damages, which is insufficient to state special damages. However, in exercising our discretion, this Court grants plaintiff the right to replead his complaint with respect to special damages.[2]

With respect to the nonfabricated portion of the second alleged defamatory statement, which reads, " 'I was gonna start shooting in the air but I decided against it,' " there is no dispute that this is a quote from plaintiff's public Twitter account. This Court also finds that this particular statement, if false, would be capable of a defamatory meaning (the first element of a defamation claim). The question then becomes whether plaintiff can adequately allege that the statement is "false" when it is an accurate quote from his public Twitter account and was initially published by him, before the Daily article was posted. Defendants argue that because this statement is a direct quote from plaintiff via Twitter, it is not actionable because it cannot meet the falsity element of a defamation cause of action. Defendants also argue that since they accurately quoted plaintiff's own statement from his public Twitter account, he is responsible for any harm to his reputation that flowed from his statement. Plaintiff argues that the way his statement from Twitter was used in the article implied that he was actually in the club and was contemplating shooting a loaded firearm, which he claims is false. Plaintiff also complains that the article left out the second portion of his tweet, which

---

**2.** Since the first cause of action for libel also includes allegations regarding the nonfabricated portion of the second alleged defamatory statement (also known as the statement quoted from Twitter), plaintiff may also replead special damages as to this statement as well.

stated that there was "[t]oo much violence in the hip hop community."

■ To satisfy the falsity element of a defamation claim, plaintiff must allege that the complained of statement is "substantially false." "If an allegedly defamatory statement is 'substantially true,' a claim of libel is 'legally insufficient and . . . should [be] dismissed' " (*Biro v Condé Nast*, 883 F Supp 2d 441, 458 [SD NY 2012] [ellipsis and alteration in original], quoting *Guccione v Hustler Mag., Inc.*, 800 F2d 298, 301 [2d Cir 1986] [applying New York law], *cert denied* 479 US 1091 [1987]). "[A] statement is substantially true if the statement would not 'have a different effect on the mind of the reader from that which the pleaded truth would have produced' " (*Biro*, 883 F Supp 2d at 458 [alteration added], quoting *Jewell v NYP Holdings, Inc.*, 23 F Supp 2d 348, 366 [SD NY 1998], quoting *Fleckenstein v Friedman*, 266 NY 19, 23 [1934]). Indeed, it is well settled in New York "that an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation" (*Guccione*, 800 F2d at 302, citing *Fleckenstein*, 266 NY at 23; *see also Fulani v New York Times Co.*, 260 AD2d 215 [1st Dept 1999]).

Courts typically compare the complained of language with the alleged truth to determine whether the truth would have a different effect on the mind of the average reader. Although it is conceded that defendant accurately quoted plaintiff's own words from Twitter, that does not necessarily mean that the statement could not have produced a worse effect on the mind of a reader than the truth as alleged by plaintiff. A reader could read the alleged defamatory statement in the context of the rest of the article and think that plaintiff was actually present in the club, prepared to shoot a firearm; whereas, a reader of plaintiff's isolated statement on Twitter may not have the same impression. In this unique case, the context of the two versions of the same statement is crucial.

It is true that courts across the country have extended the "truth defense" to include an "own words" defense (*see e.g. Thomas v Pearl*, 998 F2d 447, 452 [7th Cir 1993] [holding that "(a) party's accurate quoting of another's statement cannot defame the speaker's reputation since the speaker is himself responsible for whatever harm the words might cause. . . . The fact that a statement is true, or in this case accurately quoted, is an absolute defense to a defamation action"]; *Van*

*Buskirk v Cable News Network, Inc.*, 284 F3d 977, 981-982 [9th Cir 2002] [applying the "own words" defense despite "contextual discrepancies" between the plaintiff's own words and the defendants' quotation of those words]; *Johnson v Overnite Transp. Co.*, 19 F3d 392, 392 n 1 [8th Cir 1994] [recognizing the "general rule that a defamation claim arises only from a communication by someone other than the person defamed"]; *Smith v School Dist. of Phila.*, 112 F Supp 2d 417, 429 [ED Pa 2000] [noting that "(g)enerally, a plaintiff can not (sic) be defamed by the use of his own words"]). Although defendants cite to *Thomas v Pearl* (998 F2d 447 [1993]) in their brief, the parties failed to specifically address whether the "own words" defense should be adopted by this Court; and we are aware of no authority, in either New York State jurisprudence or in the Second Circuit, which either expressly accepts or rejects the "own words" defense. We are aware of only one case in the State, albeit a federal district court case, that even mentions the defense: *Fine v ESPN, Inc.* (11 F Supp 3d 209, 224 [ND NY 2014]), in a section titled " 'Own Words' Defense," states that it cannot reach the issue because the records needed to compare the plaintiff's and the defendant's words were not properly before the court on a motion to dismiss. This highlights, however, the importance of a court's need to compare the two statements as they appear in the actual writings before applying the "own words" defense to dismiss a defamation claim. This is also evident from the fact that the "own words" defense derives from the "truth defense." Even if we were to adopt the "own words" defense, we find that it would not apply here where a comparison of the two statements reveals the potential for them to have different effects on the mind of the reader.

## Liability of Defendant News Corp.

Defendant News Corp. argues that plaintiff failed to plead a cause of action against it, since News Corp. cannot be held liable for statements of its subsidiary. In response, plaintiff argues that his claim is actually one based upon piercing the corporate veil.

"[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury" (*James v Loran Realty v Corp.*, 85 AD3d 619, 619 [1st Dept 2011], *affd* 20 NY3d 918 [2012] [internal quotation marks omitted] [alteration in

original]). Moreover, "[t]he party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene" (*Matter of Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 142 [1993]).

Here, other than stating that the Daily "was the alter ego, instrumentality and/or agent of News Corporation," the complaint does not allege News Corp.'s "complete domination" of the Daily, or that the purpose of any such domination was to commit a wrong against plaintiff. Accordingly, the complaint's conclusory statement is insufficient (*see Morpheus Capital Advisors LLC v UBS AG*, 105 AD3d 145, 153 [1st Dept 2013], *revd on other grounds* 23 NY3d 528 [2014]; *ABN AMRO Bank, N.V. v MBIA Inc.*, 17 NY3d 208, 229 [2011]). Even considering the additional facts cited by plaintiff on appeal, such as Rupert Murdoch serving as CEO for both companies and appearing at the Daily's launch party, plaintiff's allegations are still wholly insufficient to support a claim of alter ego liability.

Accordingly, the order of Supreme Court, New York County (Milton A. Tingling, J.), entered May 16, 2014, which denied defendants' motion to dismiss the complaint, should be modified, on the law, to the extent of dismissing the first cause of action with leave to replead special damages, dismissing the second cause of action only to the extent it is based on the allegedly fabricated quotations, and dismissing the complaint against defendant News Corporation, and otherwise affirmed, without costs.

Sweeny, J.P., Renwick, Moskowitz and Feinman, JJ., concur.

Order, Supreme Court, New York County, entered May 16, 2014, modified, on the law, to the extent of dismissing the first cause of action with leave to replead special damages, dismissing the second cause of action only to the extent it is based on the allegedly fabricated quotations, and dismissing the complaint against defendant News Corporation, and otherwise affirmed, without costs.