OPINION OF THE COURT
Barbara Jaffe, J.
Plaintiff sues defendants to recover damages for alleged defamation. Defendants move pursuant to CPLR 3211 (a) (7) for an order dismissing the complaint for failure to state a cause of action. Plaintiff opposes.
I. Background
Unless otherwise indicated, the following facts are taken from plaintiff’s complaint, and are accepted as true for purposes of this motion.
Plaintiff is a “political strategist and public relations consultant” and a frequent commentator on television news channels and other media outlets, offering “political opinion and analysis from the Republican perspective.” (NY St Cts Elec Filing [NYSCEF] Doc No. 19, exhibit A, ¶¶ 9-11.) Defendant Donald J. Trump was at all relevant times a candidate for the 2016 Republican nomination for the Presidency of the United States. {Id. f 13.) Defendant Donald J. Trump for President, Inc., was the campaign organization for Trump’s presidential candidacy. (Id. 1 14.) Defendant Lewandowski was the Trump organization’s campaign manager. {Id. ¶ 12.)
On or about May 18, 2015, plaintiff received a message from nonparty Jim Dornan, then working for the campaign, asking if she would be interested in becoming the campaign’s communications director. (Id. ¶ 22.) The following day, plaintiff met with Dornan and Lewandowski, and according to plaintiff, they expressed interest in working with her, with Lewandowski asking for her salary requirements. (Id. ¶¶ 24, 27.) Later that day, Dornan sent a message to plaintiff, stating that Lewandowski wanted to meet with her again. By email to Lewandowski, plaintiff provided her salary requirements and indicated her interest in a position with the campaign. (Id. ¶¶ 28-29.)
On June 9, 2015, plaintiff met with Dornan and Lewandowski for a second time. (Id. ¶ 30.) At this meeting, during a discus *472 sion about communications issues, Lewandowski became agitated, loud, and rude, exclaiming that the FOX Television Network would do whatever the campaign wanted, and telling plaintiff that she had no idea how FOX works. (Id. ¶ 31.) As Lewandowski’s agitation mounted, Dornan left the meeting, and, soon after, plaintiff also excused herself. (Id. ¶ 32.) According to plaintiff, she then decided that she could not work for Lewandowski, and shortly thereafter, in reply to a text from Dornan, advised him that working with Lewandowski would be too difficult. (Id. ¶¶ 33-34.) No further discussions about a position with the campaign were held with Le-wandowski, or with Dornan, who subsequently stopped working for the campaign. (Id. f ¶ 35-36.) Plaintiff pursued the position no further, nor was she offered it.
On June 16, 2015, Trump formally announced his candidacy for President. In the months following his announcement, plaintiff frequently appeared on television as a commentator, and posted comments on social media sites, including Twitter, both defending and criticizing Trump. (Id. ¶¶ 37-39.)
On January 26, 2016, plaintiff appeared on a CNN cable television show to discuss Trump’s threat to boycott one of the Republican presidential primary debates unless FOX removed Megyn Kelly as a moderator. (Id. ¶¶ 45-46.) During her appearance, plaintiff characterized Trump as a “bad debater” and stated that he “comes off like a third grader faking his way through an oral report on current affairs” and was using the Megyn Kelly dispute with FOX as an excuse for avoiding the debate. (Id. ¶ 46.) The next day, during an on-air telephone call with the host of MSNBC’s Morning Joe program, Lewandowski referenced plaintiff’s comments about Trump, stating that “[t]his is the same person . . . who came to the office on multiple occasions trying to get a job from the Trump Campaign, and when she wasn’t hired clearly she went off and was upset by that.” (Id. ¶ 49.)
On February 2, 2016, plaintiff again appeared on CNN along with a Trump supporter to discuss Trump’s claims that his campaign was self-funded and CNN’s investigation finding that one third of his campaign funds came from other sources. (Id. ¶ 50.) Plaintiff remarked on the show that “there had been a Trump Super PAC, [that] the campaign lied about it, and then shut it down,” as was reported in the news. (Id.) She also said that the campaign had approached several Republican billionaire donors, all of whom had declined to donate money to Trump. (Id.)
*473 Later that night, Trump posted the following on Twitter: “Great job on @donlemon tonight @kayleighmcenany @cheri-jacobus begged us for a job. We said no and she went hostile. A real dummy! @CNN.” (Id. ¶ 50.) A day later, on February 3, 2016, plaintiffs then lawyer sent Trump a cease and desist letter. {Id. ¶ 52.) Two days after that, on February 5, 2016, Trump posted the following tweet about plaintiff: “Really dumb @CheriJacobus. Begged my people for a job. Turned her down twice and she went hostile. Major loser, zero credibility!” {Id.)
Some of Trump’s numerous Twitter followers responded to his tweets by attacking plaintiff with demeaning, sometimes sexually charged, comments and graphics, including insults aimed at her professional conduct, experience, qualifications, and her purported rejection by Trump. Also tweeted was an image of plaintiff with a grossly disfigured face, and a depiction of her in a gas chamber with Trump standing nearby ready to push a button marked “Gas.” (Id.)
Plaintiff commenced this action in April 2016, alleging that Lewandowski’s and Trump’s statements as set forth above defamed her, and that they constitute libel per se, as they accuse her of unprofessional conduct, and were intended to, and did, injure her reputation in her field and caused her to lose professional opportunities. (Id. ¶ 61.)
II. Discussion
It is well settled that “[i]n assessing the adequacy of a complaint under CPLR 3211 (a) (7), the court must give the pleading a liberal construction, accept the facts alleged in the complaint to be true and afford the plaintiff The benefit of every possible favorable inference.’ ” (J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334 [2013] [citation omitted]; see AG Capital Funding Partners, L.P. v State St. Bank & Trust Co., 5 NY3d 582, 591 [2005]; Leon v Martinez, 84 NY2d 83, 87 [1994].) “The motion must be denied if from the pleadings’ four corners Tactual allegations are discerned which taken together manifest any cause of action cognizable at law.’ ” (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002] [citations omitted]; see Polonetsky v Better Homes Depot, 97 NY2d 46, 54 [2001]; Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].)
*474 A. Defamation
1. General Considerations
A defamatory statement is “a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace” (Thomas H. v Paul B., 18 NY3d 580, 584 [2012]; see Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 379 [1977], cert denied 434 US 969 [1977]), “or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community” (Golub v Enquirer/Star Group, 89 NY2d 1074, 1076 [1997] [citation omitted]; see Foster v Churchill, 87 NY2d 744, 751 [1996]; Franklin v Daily Holdings, Inc., 135 AD3d 87, 91 [1st Dept 2015]; see also Jewell v NYP Holdings, Inc., 23 F Supp 2d 348, 360-361 [SD NY 1998]). To sustain a cause of action for defamation, the plaintiff must plead (1) a false statement, and (2) publication of it to a third party, (3) absent privilege or authorization, which (4) causes harm, unless the statement is defamatory per se, in which case harm is presumed. (Stepanov v Dow Jones & Co., Inc., 120 AD3d 28, 34 [1st Dept 2014]; Frechtman v Gutterman, 115 AD3d 102, 104 [1st Dept 2014], citing Dillon v City of New York, 261 AD2d 34, 38 [1st Dept 1999]; see Franklin, 135 AD3d at 91.)
Whether particular words are defamatory constitutes “a legal question to be resolved by the court in the first instance.” (Golub, 89 NY2d at 1076; Armstrong v Simon & Schuster, 85 NY2d 373, 380 [1995]; Aronson v Wiersma, 65 NY2d 592, 593 [1985]; James v Gannett Co., 40 NY2d 415, 419 [1976].) If the words are “not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained and artificial construction.” (Golub, 89 NY2d at 1076; Aronson, 65 NY2d at 593-594.) Thus, the court must determine “ ‘whether the contested statements are reasonably susceptible of a defamatory connotation’ . . . ‘[and] [i]f, upon any reasonable view of the stated facts, plaintiff would be entitled to recovery for defamation, the complaint must be deemed to sufficiently state a cause of action.’ ” (Davis v Boeheim, 24 NY3d 262, 268 [2014] [citations omitted]; see Armstrong, 85 NY2d at 380; Silsdorf v Levine, 59 NY2d 8, 12 [1983], cert denied 464 US 831 [1983]; Mencher v Chesley, 297 NY 94, 100 [1947] [court may not determine sole meaning of words, only whether reasonable basis exists for defamatory interpretation].) It is then for a jury to determine “whether that was the sense in which the words were likely to be understood by the ordinary and *475 average reader.” (James, 40 NY2d at 419, quoting Mencher, 297 NY at 100.)
“Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable.” (Dillon, 261 AD2d at 38, citing Gross v New York Times Co., 82 NY2d 146, 152 [1993], and Immuno AG. v Moor-Jankowski, 77 NY2d 235, 244 [1991], cert denied 500 US 954 [1991].) However, that some readers may infer a defamatory meaning from a statement does not necessarily render the inference reasonable under the circumstances. (See e.g. Ava v NYP Holdings, Inc., 64 AD3d 407, 414 [1st Dept 2009], lv denied 14 NY3d 702 [2010]; Kramer v Skyhorse Publ., Inc., 45 Misc 3d 315, 325 [Sup Ct, NY County 2014, Jaffe, J.].)
2. Context is Key
Words that are challenged as defamatory “must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader.” (Aronson, 65 NY2d at 594; see Armstrong, 85 NY2d at 380; James, 40 NY2d at 419-420; Ava, 64 AD3d at 413.) All relevant factors may be considered in determining whether a word or statement is defamatory (Farher v Jefferys, 33 Misc 3d 1218[A], 2011 NY Slip Op 51966[U], *15 [Sup Ct, NY County 2011], affd 103 AD3d 514 [1st Dept 2013], lv denied 21 NY3d 858 [2013], citing Steinhilber v Alphonse, 68 NY2d 283, 291-292 [1986]), and courts have considerable discretion in deciding whether a statement is defamatory, guided only by “the words themselves and their purpose, the circumstances surrounding their use, and the manner, tone and style with which they are used.” (Steinhilber, 68 NY2d at 291-292.)
As context is key (Thomas H., 18 NY3d at 584-585; see Brahms v Carver, 33 F Supp 3d 192, 198-199 [ED NY 2014] [citing examples]), defamatory statements advanced during the course of a heated public debate, during which an audience would reasonably anticipate the use of “epithets, fiery rhetoric or hyperbole,” are not actionable (Frechtman, 115 AD3d at 106, quoting Steinhilber, 68 NY2d at 294).
3. Opinion
a. In General
The privilege protecting the expression of an opinion is rooted in the preference that ideas be fully aired. (Davis, 24 NY3d at 269, citing Steinhilber, 68 NY2d at 289, and Gertz v Robert Welch, Inc., 418 US 323, 339-340 [1974].) It is, thus, well settled that “[expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be *476 the subject of an action for defamation.” (Davis, 24 NY3d at 269; Mann v Abel, 10 NY3d 271, 276 [2008]; see Steinhilber, 68 NY2d at 289; Rinaldi, 42 NY2d at 380; Martin v Daily News L.R, 121 AD3d 90, 100 [1st Dept 2014], lv denied 24 NY3d 908 [2014].) Moreover, an opinion cannot be proved false. (Mann, 10 NY3d at 276.)
Privileged statements of opinion are either accompanied by the facts on which they are based, or do not imply that they are based on undisclosed facts. (Gross, 82 NY2d at 153-154.) “When a statement of opinion implies that it is based on unstated facts that justify the opinion, the opinion becomes an actionable ‘mixed opinion’ ” (Egiazaryan v Zalmayev, 880 F Supp 2d 494, 503 [SD NY 2012], quoting Steinhilber, 68 NY2d at 289), “because a reasonable listener or reader would infer that ‘the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed]’ ” (Gross, 82 NY2d at 153-154, quoting Steinhilber, 68 NY2d at 290). And “if the predicate facts are disclosed but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion’s validity,” the statement may be actionable as a “defamatory opinion” (Enigma Software Group USA, LLC v Bleeping Computer LLC, 194 F Supp 3d 263, 281 [SD NY 2016], citing Silsdorf v Levine, 59 NY2d 8, 15-16 [1983], cert denied 464 US 831 [1983]; see also Parks v Steinbrenner, 131 AD2d 60, 62-63 [1st Dept 1987]).
An asserted fact may be distinguished from a nonactionable opinion if the statement: (1) has a precise, readily understood meaning, that is (2) capable of being proved true or false, and (3) where the full context in which it is asserted or its broader social context and surrounding circumstances indicate to readers or listeners that it is likely fact, not opinion. (Davis, 24 NY3d at 270-271, citing Mann, 10 NY3d at 276; Brian v Richardson, 87 NY2d 46, 51 [1995]; Gross, 82 NY2d at 153; Steinhilber, 68 NY2d at 292.) The plaintiff bears the burden of proving “that in the context of the entire communication a disputed statement is not protected opinion.” (Celle v Filipino Reporter Enters. Inc., 209 F3d 163, 179 [2d Cir 2000].)
i. Precise, Readily Understood Meaning
Words have been characterized as “imprecise” when they are “indefinite and ambiguous” (Parks, 131 AD2d at 63, citing Ollman v Evans, 750 F2d 970, 983 [DC Cir 1984], cert denied 471 US 1127 [1985]), and when they “may mean different things to *477 different people,” and cannot be proved true or false because of their “subjective, relative meanings.” (Live Face on Web, LLC v Five Boro Mold Specialist Inc., 2016 WL 1717218, *2, 2016 US Dist LEXIS 56601, *7 [SD NY, Apr. 28, 2016, No. 15 CV 4779-LTS-SN].) Thus, in Springer v Almontaser, the defendant, upon resigning as principal of a school for Arabic language and culture, and following the plaintiffs’ public campaign against it, accused the plaintiffs of, inter alia, stalking and harassing her. (75 AD3d 539 [2d Dept 2010], lv denied 15 NY3d 713 [2010].) The Court held that because the terms “stalked” and “harassed” had no precise, readily understood meaning, they would be clearly understood by a reasonable listener as an expression of how the defendant felt. (75 AD3d at 540-541.)
By contrast, in Kaplan v Khan, during the course of a prayer meeting, the defendant called the plaintiff a “whore” and accused her of “running a house of prostitution.” The motion court found that the words had a “sufficiently precise meaning.” (31 Misc 3d 1227[A], 2011 NY Slip Op 50879[U], *8 [Sup Ct, Kings County 2011].)
ii. Capable of Being Proved True or False
As noted supra (II [A] [3] [a] [i]), where a statement is subjective and imprecise, it is not susceptible of being proved true or false. {Live Face on Web, 2016 WL 1717218, 2016 US Dist LEXIS 56601.) Some statements, however, appear on their face to be capable of being proved true or false, such as in Davis, where the defendant made statements that the plaintiffs “made false sexual abuse allegations” against a coach to get money, and that one of the plaintiffs had done so in the past. (24 NY3d at 271; see also Karachi v Weissman, 125 AD3d 142, 157-158 [2d Dept 2014] [statements that plaintiff rabbi failed to: appear for morning services, perform outreach for young families, use the traditional prayer book, and lead High Holiday services, etc., found “thoroughly capable of being proven true or false”].)
iii. Full Context or Broader Social Context and Surrounding Circumstances
“[E]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an ‘audience may anticipate [the use] of epithets, fiery rhetoric or hyperbole.’ ” (Steinhilber, 68 NY2d at 294, quoting Information Control Corp. v Genesis One Computer Corp., 611 F2d 781, 784 [9th Cir 1980].) Thus, as with *478 any statement challenged as defamatory (supra at II [A] [2]), the context must be examined in order to determine whether a reasonable reader would have believed that the communication was fact, not opinion. (Davis, 24 NY3d at 270, quoting Brian, 87 NY2d at 51.) However, in distinguishing fact from opinion by reference to “the content of the communication as a whole, as well as its tone and apparent purpose,” the reviewing court should not pick apart the challenged communication to isolate and identify factual assertions. (Brian, 87 NY2d at 51.)
Certain contexts may indicate whether a statement constitutes fact or opinion. An investigative article in the news section of the New York Times was held to be a context reflecting the factual nature of statements reported therein (Gross v New York Times Co., 82 NY2d 146, 155-156 [1993]), whereas a newspaper’s editorial page was found to be a context indicating that the challenged statement constituted an opinion (Brian, 87 NY2d at 53), as was a letter to the editor of a professional journal (Immuno AG. v Moor-Jankowski, 77 NY2d 235 [1991], cert denied 500 US 954 [1991]), a public community board hearing (600 W. 115th St. Corp. v Von Gutfeld, 80 NY2d 130 [1992]), and communications between a union official and a “scab” during a heated labor dispute (Steinhilber v Alphonse, 68 NY2d 283 [1986]).
In addition, “[t]he culture of Internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a ‘freewheeling, anything-goes writing style.’ ” (Sandals Resorts Intl. Ltd. v Google, Inc., 86 AD3d 32, 43-44 [1st Dept 2011] [citation omitted]; see LeBlanc v Skinner, 103 AD3d 202, 213 [2d Dept 2012] [“Internet forums are venues where citizens may participate and be heard in free debate involving civic concerns”].) Thus, “epithets, fiery rhetoric or hyperbole” advanced on social media have been held to warrant an understanding that the statements contained therein are “vigorous expressions of personal opinion,” “rather than the rigorous and comprehensive presentation of factual matter.” (Brian, 87 NY2d at 52 [internal quotation marks and citations omitted]; see O’Mahony v Whiston, 2016 NY Slip Op 31896[U], *6-7 [Sup Ct, NY County 2016]; see also Matter of Konig v WordPress.com, 112 AD3d 936, 937 [2d Dept 2013] [reasonable reader would believe that statements made on an Internet blog during sharply contested election generally referencing “downright criminal actions” were opinion, “not a factual accusation of criminal conduct”].)
*479 Consequently, “New York courts have consistently protected statements made in online forums as statements of opinion rather than fact.” (Bellavia Blatt & Crossett, P.C. v Kel & Partners LLC, 151 F Supp 3d 287, 295 [ED NY 2015] [citations omitted]; see Matter of Woodbridge Structured Funding, LLC v Pissed Consumer, 125 AD3d 508, 509 [1st Dept 2015] [disgruntled tone, anonymous posting, and predominant use of statements on consumer grievance website that cannot be definitively proved true or false support finding challenged statements constitute nonactionable opinion]; Sandals Resorts, 86 AD3d at 43-44 [so-called social media, such as Facebook and Twitter, is increasingly deemed to attract “less credence to allegedly defamatory remarks” than other contexts, noting that “bulletin boards and chat rooms are often the repository of a wide range of casual, emotive, and imprecise speech” (internal quotation marks and citation omitted)]; Versaci v Richie, 30 AD3d 648, 649 [3d Dept 2006], lv denied 7 NY3d 710 [2006] [statement about plaintiff made in “rambling commentary” “on an Internet public message board . . . where people air concerns about any matter” was opinion]; Brahms v Carver, 33 F Supp 3d 192, 198-199 [ED NY 2014] [statement nonactionable opinion where “made on an internet forum where people typically solicit and express opinions” and in context of a “heated argument—replete with name-calling”]; Biro v Conde Nast, 2014 WL 4851901, *4, 2014 US Dist LEXIS 139065, *12 [SD NY, Sept. 29, 2014, No. 11-CV-4442 (JPO)] [plaintiff failed to state defamation claim “buttressed by the context of the publications in question: an online website that was essentially a blog”].)
Similarly, comments made on television talk shows, given the “give and take” of the show, and the “spirited” verbal exchanges between the host and guest, and the “at times heated” “interplay with audience members,” are deemed nonactionable opinion. (Huggins v Povitch, 1996 WL 515498, *7 [Sup Ct, NY County, Apr. 19, 1996, No. 131164/94]; see Hobbs v Imus, 266 AD2d 36, 37 [1st Dept 1999] [“in the context of the ribald radio ‘shock talk’ show” where hosts’ “crude and hyperbolic manner . . . (became) their verbal stock in trade,” defendants’ “(g)ratuitously tasteless and disparaging” remarks about plaintiff properly deemed nonactionable opinion].)
A purportedly defamatory statement’s broader social context and surrounding circumstances must also be analyzed in terms of the content of the statement “as a whole, its tone and appar *480 ent purpose” (Davis, 24 NY3d at 270, quoting Brian v Richardson, 87 NY2d 46, 51 [1995] [other citations omitted]), in order to determine “ ‘whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff’ ” (Brian, 87 NY2d at 51 [citations omitted]; Davis, 24 NY3d at 270; see Guerrero v Carva, 10 AD3d 105, 111-112 [1st Dept 2004]; Enigma Software Group USA, LLC v Bleeping Computer LLC, 194 F Supp 3d 263, 282 [SD NY 2016]).
4. Defamation Per Se
As pertinent here, a statement that “suggests improper performance of one’s professional duties or unprofessional conduct” (Frechtman v Gutterman, 115 AD3d 102, 104 [1st Dept 2014]), or otherwise “tend[s] to injure another in his or her trade, business or profession” may be actionable as defamation per se without proof or allegations of special damages (Liberman v Gelstein, 80 NY2d 429, 435 [1992]; see Geraci v Probst, 15 NY3d 336, 344 [2010]). “Reputational injury to a person’s business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one’s duties.” (Enigma Software Group, 194 F Supp 3d at 290, quoting Van-Go Transp. Co., Inc. v New York City Bd. of Educ., 971 F Supp 90, 98 [ED NY 1997].) The challenged statement “must be more than a general reflection upon [the plaintiff’s] character or qualities. . . . [it] must reflect on her performance or be incompatible with the proper conduct of her business” (Golub v Enquirer/ Star Group, 89 NY2d 1074, 1076 [1997] [citations omitted]), and relate to “a matter of significance and importance for that purpose” (Liberman, 80 NY2d at 436, citing Prosser & Keeton, Torts § 112 at 791 [5th ed 1984]; see also Kerik v Tacopina, 64 F Supp 3d 542, 570 [SD NY 2014]).
Some statements are actionable defamation per se because they discredit one in his chosen calling, such as
“to say of a physician that he is a butcher . . . , of an attorney that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his office for corrupt purposes.” (Celle v Filipino Reporter *481 Enters. Inc., 209 F3d 163, 180 [2d Cir 2000] [citations omitted]; Treppel v Biovail Corp., 2004 WL 2339759, *9-10, 2004 US Dist LEXIS 20714, *31 [SD NY, Oct. 15, 2004, No. 03 Civ 3002 (PEL)].)
On the other hand, it has been held that calling a judge incompetent, accusing a former director of the State Lottery of “systematically cheating” the public, and describing a teacher who had received unearned pay while on sick leave as a “no-show” are nonactionable expressions of opinion. (Trump v Chicago Tribune Co., 616 F Supp 1434, 1436-1437 [SD NY 1985] [architectural critic’s negative statements about plaintiff’s building constitute nonactionable opinion].)
It is also well settled that being fired or removed from office, absent any insinuation of misconduct, does not imply professional misconduct or incompetence or otherwise impugn an individual’s integrity. {Aronson v Wiersma, 65 NY2d 592, 594 [1985] [statements that plaintiff not doing her job and had to be fired did not defame her in her trade, business or profession]; Nichols v Item Pubis., 309 NY 596, 601 [1956] [“one’s removal from office carries no imputation of dishonesty or lack of professional capacity” and can be defamatory “only when the publication contains an insinuation that the dismissal was for some misconduct” (citations omitted)]; Chang v Fa-Yun, 265 AD2d 265, 265 [1st Dept 1999] [“ ‘The mere statement of discharge or termination from employment, even if untrue, does not constitute libel’ ” (citation omitted)]; Dworin v Deutsch, 2008 WL 508019, *7, 2008 US Dist LEXIS 13655, *19-20 [SD NY, Feb. 22, 2008, No. 06 Civ 13265 (PKC)] [statements in book that plaintiff was forced to resign, even if untrue, not defamatory absent insinuation of misconduct].) A fortiori, professional misconduct, incompetence, or a lack of integrity may not be reasonably inferred from being turned down for a job.
B. Contentions
In support of their motion, defendants argue that the statements in question, including Trump’s statement that she “begged” for a job and was rejected, constitute hyberbolic rhetoric, too vague to be defamatory. (NYSCEF Doc No. 15.)
The gravamen of plaintiff’s complaint is that Lewandowski, in a statement made on a talk show, and Trump, in two comments posted on Twitter, falsely represented that she had sought a job from them, was rejected, and thus made biased comments about Trump. (NYSCEF Doc No. 20 at 15-16, 20.) Plaintiff argues that by these statements, “[defendants, in *482 sum and substance, falsely declared that [she] sacrified her professional integrity to attack defendants when she was denied employment” (id. at 21), and made her “look terrible” (id. at 14-15).
Plaintiff essentially acknowledges that the statements that she “went off,” “was upset,” and “went hostile,” constitute non-actionable speculation, hyperbolic rhetoric, and pure opinion. (Id. at 14.) She also does not argue that Trump’s tweeted insults, such as calling her “a real dummy,” “really dumb,” “major loser, zero credibility,” are anything other than opinion “piled on” to his comments. (Id. at 15.)
Rather, plaintiff’s defamation claims are based on defendants’ “deliberate fabrications” of “what they claim caused her to express the views she expressed, which was that she begged for a job and was turned down” (id. at 14), and “then exacted her revenge by attacking Trump on television” (id. at 15). Whether she sought the job and was rejected, she alleges, constitutes straightforward fact, and the statements that she “came to us” and “begged” for a job and was “turned down” are false. (Id. at 14.)
The truth, plaintiff asserts, is that she met twice with Le-wandowski, at defendants’ request, and decided not to pursue the position because of Lewandowski’s rude and unprofessional conduct during her second meeting with him. These false statements about her, plaintiff claims, were made in retaliation for her negative comments about Trump, and “for the deliberate purpose of impugning her integrity and neutralizing her negative commentary.” (Id. at 15.) She states that she not only sufficiently alleges that “her standing within her professional world and in the broader public community would tend to be damaged” by defendants’ false assertions that she was biased against Trump because she was rejected for a job (id. at 20), but also that
“in fact her professional standing suffered enormous damage, as she became damaged goods no longer invited by the networks to ply her trade . . . [and] she actually was exposed to hatred, contempt and aversion, and the libels induced an evil or unsavory opinion of her in the minds of millions of people”

(id.).

C. Analysis
Trump’s characterization of plaintiff as having “begged” for a job is reasonably viewed as a loose, figurative, and hyperbolic *483 reference to plaintiff’s state of mind and is therefore not susceptible of objective verification. (But see California v Green, 399 US 149, 158 [1970], quoting 5 Wigmore, Evidence § 1367 at 32 [3d ed 1940] [characterizing cross-examination as “the greatest legal engine ever invented for the discovery of truth”].) To the extent that the word “begged” can be proved to be a false representation of plaintiff’s interest in the position, the defensive tone of the tweet, having followed plaintiff’s negative commentary about Trump, signals to readers that plaintiff and Trump were engaged in a petty quarrel. Lewandowski’s comments, overall, are speculative and vague, and defendants’ implication that plaintiff was retaliating against them for turning her down, notwithstanding the unmistakable reference to her professional integrity, is clearly a matter of speculation and opinion.
Moreover, the immediate context of defendants’ statements is the familiar back-and-forth between a political commentator and the subject of her criticism, and the larger context is the Republican presidential primary and Trump’s regular use of Twitter to circulate his positions and skewer his opponents and others who criticize him, including journalists and media organizations whose coverage he finds objectionable. (See e.g. Jasmine C. Lee & Kevin Quealy, The Upshot, The 289 People Places and Things Donald Trump Has Insulted on Twitter: A Complete List, NY Times [digital ed], Dec. 6, 2016, http:// www.nytimes.com/interactive/2016/01/28/upshot/donald-trump-twitter-insults.html [accessed Jan. 8, 2017].) His tweets about his critics, necessarily restricted to 140 characters or less, are rife with vague and simplistic insults such as “loser” or “total loser” or “totally biased loser,” “dummy” or “dope” or “dumb,” “zero/no credibility,” “crazy” or “wacko,” and “disaster,” all deflecting serious consideration. (Id.; see Technovate LLC v Fanelli, 49 Misc 3d 1201[A], 2015 NY Slip Op 51349[U], *4 [Civ Ct, Richmond County 2015] [“On-line speech often is characterized by the use of slang, grammatical mistakes, spelling errors, and a general lack of coherence”]; Ellyn M. An-gelotti, Twibel Law: What Defamation and its Remedies Look Like in the Age of Twitter, 13 J High Tech L 430, 433 [2013] [“The informal nature of conversation on Twitter tends to encourage people to talk more freely about others, including the spreading of rumors and potential falsehoods”].)
And yet, the context of a national presidential primary and a candidate’s strategic and almost exclusive use of Twitter to *484 advance his views arguably distinguish this case from those where heated rhetoric, with or without the use of social media, was held to constitute communications that cannot be taken seriously. (See e.g. Gerald K Seib, The Method in Donald Trump’s Maddening Communications Habits, Wall St J, Jan. 2, 2017, http://www.wsj.com/articles/the-method-in-donald-trumps-maddening-communications-habits-1483377825 [there “seem to be specific objectives behind many of Mr. Trump’s seemingly scattershot missives and comments,” and that while there is “danger” in leaving the world unsure which messages to take literally, it is “also likely Mr. Trump knows exactly what he is doing”]; David Danford, Why Donald Trump’s Constant Twitter Battle with the Media is a Brilliant Strategy, The Federalist, Dec. 7, 2016, http://thefederalist.com/2016/12/ 07/donald-trumps-constant-twitter-battle-media-brilliant-strategy/ [“Trump’s seemingly off-the-cuff and thoughtless tweets are no small part of this fascinating display of political skill”].) These circumstances raise some concern that some may avoid liability by conveying positions in small Twitter parcels, as opposed to by doing so in a more formal and presumably actionable manner, bringing to mind the acknowledgment of the Court of Appeals that “[t]he publisher of a libel may not, of course, escape liability by veiling a calumny under artful or ambiguous phrases . . . .” (Nichols v Item Pubis., 309 NY 596, 601 [1956].)
Nevertheless, consistent with the foregoing precedent and with the spirit of the First Amendment, and considering the statements as a whole (imprecise and hyperbolic political dispute cum schoolyard squabble), I find that it is fairly concluded that a reasonable reader would recognize defendants’ statements as opinion, even if some of the statements, viewed in isolation, could be found to convey facts. Moreover, that others may infer a defamatory meaning from the statements does not render the inference reasonable under these circumstances.
Thus, although the intemperate tweets are clearly intended to belittle and demean plaintiff, any reasonable reading of them makes it “impossible to conclude that [what defendants said or implied] . . . could subject . . . plaintiff! ] to contempt or aversion, induce any unsavory opinion of [her] or reflect adversely upon [her] work,” or otherwise damage her reputation as a partisan political consultant and commentator. (Nichols, 309 NY at 601; see also Fulani v New York Times Co., 260
*485 AD2d 215, 216 [1st Dept 1999] [statement that plaintiff is currently a member of cult-like political group, which she no longer belonged to, “could not have had a different or worse effect on the mind of a reasonable reader than the truth”].) Indeed, to some, truth itself has been lost in the cacophony of online and Twitter verbiage to such a degree that it seems to roll off the national consciousness like water off a duck’s back. (See e.g. Farhad Manjoo, How the Internet is Loosening Our Grip on the Truth, NY Times, Dec. 2, 2016, http://www.nytimes.com/ 2016/11/03/technology/how-the-internet-is-loosening-our-grip-on-the-truth.html [accessed Jan. 8, 2017] [because there is more media from which to choose, people tend to focus on information that fits their personal opinions or narrative whether or not factually accurate].)
For all of these reasons, I observe, as did the court in Trump v Chicago Tribune Co., that New York courts have found “cases presenting] claims far more compelling than that advanced by plaintiff here ... to involve expressions of opinion entitled to full First Amendment protection.” (616 F Supp 1434, 1437 [SD NY 1985] [citations omitted].)
Given this result, there is no need to address whether the challenged statements constitute defamation per se. In any event, while it is not disputed that a campaign employee first approached plaintiff about the position, a determination of what the parties thought during the interview process, and why and how the process ended requires inquiry into their subjective beliefs. Moreover, there is no dispute that after plaintiff’s second meeting with Lewandowski, neither she nor defendants pursued the matter any further, and she was not offered the position. Thus, defendants’ statements that they rejected plaintiff for a campaign position do not suggest that she improperly performed her professional duties, engaged in unprofessional conduct, or otherwise tended to injure her in her profession, that of a political commentator during a particularly raucous Republican presidential primary.
III. Conclusion
In light of the foregoing, and absent any authority for the proposition that the circumstances of this case render defendants’ statements an exception to what appears to be the law that they are nonactionable opinion, plaintiff fails to state a *486 claim. Accordingly, it is hereby ordered that defendants’ motion to dismiss is granted, and the complaint is dismissed in its entirety.