[987 NYS2d 37]

MAXIM A. STEPANOV et al., Appellants, v DOW JONES & COMPANY, INC., Respondent.

First Department, May 29, 2014

### APPEARANCES OF COUNSEL

*Ganfer & Shore, LLP*, New York City (*Steven Skulnik* of counsel), for appellants.

*Davis Wright Tremaine, LLP*, New York City (*Laura R. Handman, Camille Calman* and *Jason P. Conti* of counsel), for respondent.

### OPINION OF THE COURT

FEINMAN, J.

Nearly two decades ago, the Court of Appeals acknowledged that there existed an open question under New York law regarding which test to apply to claims of defamation by implication, but did not reach the issue and concluded that the choice must "await another day" (*Armstrong v Simon & Schuster*, 85 NY2d 373, 381 [1995]). While no appellate court in this state has since addressed that particular issue, its day has finally come.

Plaintiffs, a Russian businessman and a company he founded (Midland Consult [Cyprus] Ltd.), claim that they were defamed in Bill Alpert's article *Crime and Punishment in Putin's Russia*, which appeared on April 18, 2011 in Barron's, a weekly newspaper published by defendant. The article described an embezzlement conspiracy involving Russian businessmen and officials.

The article reported that in 2006, the hedge fund Hermitage Capital realized a profit of about $1 billion and paid $230 million in taxes to Russia. Russian Interior Ministry police raided Hermitage's Moscow offices in June 2007, seizing its Russian subsidiaries' corporate seals and certificates. In October of that year, a "convicted killer" used the corporate seals to act in the subsidiaries' names to consent to judgments in a Russian court totaling about $1 billion. On December 23, 2007, he and his "cohorts," masquerading as Hermitage officers, filed for a $230 million tax refund, applying the judgments against Hermitage's $1 billion in profits. On the following day, the Moscow tax bureau, headed by Olga Stepanova, approved the refund and wired the money to "brand-new accounts" at Moscow banks.

Hermitage launched a private investigation, hiring Russian lawyer Sergei Magnitsky. Credit Suisse records obtained through the investigation showed at least $20 million flowing through the bank accounts of a number of "dummy corporations" associated with small nations in the two years following the $230 million heist. Hermitage's informant, a Russian businessman who had been part of a network that paid Olga Stepanova and other officials for their roles in tax embezzlements, told Hermitage that these Credit Suisse transactions were intended as payments to Stepanova and her deputies for their assistance in the scam.

The article goes on to detail a number of transactions involving the Credit Suisse accounts. In doing so, it refers to plaintiffs in the following three paragraphs, out of the 40 comprising the entire article:

> "On Jan. 23, 2008 the Credit Suisse accounts received about $3 million from a shell company called Bristoll Export, registered in New Zealand by a company-formation agency called GT Group. After earlier *Barron's* stories showed that GT Group sold shells that were ultimately used to launder Mexican drug-cartel money through Wachovia Bank and, separately, to commission a plane filled with anti-

aircraft missiles and rocket launchers from North Korea, New Zealand police raided GT Group's offices in October of 2010.

"Nested inside the shell of Bristoll Export—like a Russian doll—was yet another shell company whose directors work at Midland Consult, a Russia-focused representative of offshore banks founded by a former Russian diplomat named Maxim A. Stepanov in Cyprus.

"The GT Group didn't respond to questions e-mailed to its headquarters on the island of Vanuatu. Midland Group's Maxim Stepanov would not identify the owners of Bristoll Export and said in an e-mail that his customers were 'honest, decent businessmen and have no criminal conduct found by the Courts of Justice' " (Bill Alpert, *Crime and Punishment in Putin's Russia* [Apr. 16, 2011], Barron's, available at http://online.barrons.com/news/articles/SB5000142405297020456960457625931 3266852054).

The article also reported that, shortly after the tax refund was approved by Olga Stepanova, her husband's Cyprus shell corporation received $10.9 million. Although the article does not expressly state the husband's identity, it identifies a number of properties owned by Vladlen Stepanov, "the Stepanovs," and "Stepanova's family" and refers to "Olga's obligatory income declarations" showing the cumulative income "between herself and Vladlen" (*id.*).

In July 2008, Hermitage's lawyer Magnitsky filed criminal complaints with Russian government agencies, accusing Olga Stepanova, Police Colonel Kuznetsov, and others of being involved in the Hermitage fraud and another similar scheme. When Magnitsky testified to Russian prosecutors in October 2008, he was arrested, delivered to Kuznetsov, and imprisoned, where he was subjected to "harsh conditions" and pressured to retract his testimony and implicate himself. While in prison, the 37-year-old attorney "became gravely ill and, denied medical care, died on November 16, 2009" (*id.*). This led the Russian businessman mentioned above to become Hermitage's informant and provide the Credit Suisse bank records. In January 2011, Hermitage filed a complaint with the Swiss Federal Attorney General. It appears that the informant's bank records and the Swiss complaint provided the factual basis for most of the article's assertions.

In the complaint in this action, plaintiffs contended that the article was defamatory, stating that it was "false, disparaging, derogatory, and misleading to state or imply": (1) that Midland was doing business with GT Group in 2010 when GT allegedly sold shell corporations to individuals involved in narcotics and weapons; (2) that Midland was involved with the companies used to launder drug-cartel money and ship weapons; (3) that Bristoll Export or its subsidiaries had directors who "work at Midland Consult"; and (4) that plaintiff Stepanov was a former Russian diplomat, because the article is entitled *Crime and Punishment in Putin's Russia*, but Stepanov served as a diplomat under Mikhail Gorbachev and Boris Yeltsin, not Vladimir Putin.

Defendant moved to dismiss the complaint, arguing that the article was not defamatory to plaintiffs because it was substantially true that plaintiffs had a connection to Bristoll Export and that the article's statements could not support a cause of action for defamation because they "were either not 'of and concerning' plaintiff[s] or not capable of having a defamatory meaning." Alternatively, defendant argued that the statements were privileged under Civil Rights Law § 74 as a fair and true report of an official proceeding in Switzerland. Defendant submitted copies of the article, Hermitage's Swiss complaint, and a follow-up article by Alpert and published in Barron's that reported that the Swiss Attorney General had commenced a criminal investigation.

In opposition, plaintiffs submitted an affidavit from plaintiff Stepanov stating that he resigned from the government in 1997, before Putin became president, that Midland Consult was not involved with Bristoll Export until after the January 2008 transaction, that Midland Consult had severed ties with GT Group before GT's "first legal troubles concerning the airplane," and that he has no connection to Olga Stepanova or Vladlen Stepanov. He asserted that these facts show plaintiffs had nothing to do with the actions described in the article and that, had the timeline been included in the article, it would have been clear that the mention of plaintiffs was extraneous to the news story. Based on this, plaintiffs argued that the article's statements were defamatory per se when viewed in context or, alternatively, defamatory by implication. Plaintiffs did not allege that any statement was explicitly inaccurate, but argued that the article did not include statements that would eliminate an inference that plaintiffs were involved with people and

companies engaged in illegal activity. Plaintiffs also argued that Civil Rights Law § 74 was inapplicable.

In reply, defendant argued that publishers can only be held responsible for what is actually written, stating that nothing in the article implied that plaintiffs were responsible for any wrongdoing and asserting that its inclusion of plaintiffs in the article was a matter of editorial judgment.

The court granted defendant's motion and dismissed the complaint (2013 NY Slip Op 33584[U] [2013]). It found that Civil Rights Law § 74 does not apply to the specific facts of this case, but that plaintiffs did not state a valid claim for express or implied defamation. Plaintiffs appealed this ruling, which we now affirm.

Defamation is "the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society" (*Foster v Churchill*, 87 NY2d 744, 751 [1996] [internal quotation marks omitted]). To prove a claim for defamation, a plaintiff must show: (1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm (*see Dillon v City of New York*, 261 AD2d 34, 38 [1st Dept 1999]). Because the falsity of the statement is an element of the defamation claim, the statement's truth or substantial truth is an absolute defense (*see Konrad v Brown*, 91 AD3d 545, 546 [1st Dept 2012], *lv denied* 19 NY3d 804 [2012]). On a motion to dismiss a defamation claim, the court must decide whether the statements, considered in the context of the entire publication, are "reasonably susceptible of a defamatory connotation," such that the issue is worthy of submission to a jury (*Silsdorf v Levine*, 59 NY2d 8, 12 [1983], *cert denied* 464 US 831 [1983] [internal quotation marks omitted]).

Insofar as plaintiffs' complaint is premised on express defamation, it must be dismissed, as these claims are based on substantially true statements that are not reasonably susceptible of defamatory connotations.

 Plaintiffs argue that, by describing various illegal activities of GT Group and noting the links between GT Group and Bristoll Export and between Bristoll Export and Midland Consult, the article defamed them by leading readers to believe that Midland was connected to the Bristoll wire transfer and

GT's illegal activity. The article, however, only states that a "shell company whose directors work at Midland Consult" was "[n]ested inside the shell of Bristoll Export." At most, the article is pointing out a connection between a Bristoll Export shell company and certain directors who work at Midland Consult in the present (as of the article's publication). It does not state that there was a connection during the events of late 2007 and early 2008, over three years before the publication. Exhibits to Hermitage's Swiss complaint show that, at the time of the publication, the shell company referred to in the article was in fact the owner of Bristoll Export. Although the article indicated that Bristoll owned Midland and not vice versa, the article's assertion that the two were connected is substantially true. Therefore, it is not capable of the defamatory connotation that plaintiffs claim it carries.

Plaintiffs also argue that identifying Maxim Stepanov as a "former Russian diplomat" is expressly defamatory when viewed in conjunction with the article's headline, *Crime and Punishment in Putin's Russia*, because he served as a diplomat before Putin's presidency. The article's statement is clearly true, as plaintiffs made clear that Maxim Stepanov was, in fact, a former Russian diplomat. Furthermore, even if the language could be construed to mean that Stepanov served during Putin's tenure, the corruption detailed in the article involved Russian police and tax officials, not diplomats. This statement is also clearly not expressly defamatory.

Plaintiffs' chief argument, however, is that the article's statements were defamatory by implication. "Defamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements" (*Armstrong v Simon & Schuster*, 85 NY2d at 380-381 [internal quotation marks omitted]). The implied defamation cause of action was recognized by the Court of Appeals in a 1963 decision determining that, although the publication at issue contained no directly defamatory statements, "a jury should decide whether a libelous intendment would naturally be given to it by the reading public acquainted with the parties and the subject-matter" (*November v Time Inc.*, 13 NY2d 175, 179 [1963] [internal quotation marks omitted]). The following year, the U.S. Supreme Court's landmark decision in *New York Times Co. v Sullivan* (376 US 254 [1964]) found that the free speech protections guaranteed by the First Amendment to the US Constitution placed substantial limits on the right to

recover for defamatory statements (*see also Chapadeau v Utica Observer-Dispatch*, 38 NY2d 196, 198 [1975]). In a 1977 libel decision, after discussing the impact *Sullivan* had on defamation jurisprudence, the Court of Appeals addressed an aspect of the plaintiff's claim that was akin to implied defamation, noting that although an author "could not make up facts out of whole cloth, omission of relatively minor details in an otherwise basically accurate account is not actionable. This is largely a matter of editorial judgment in which the courts, and juries, have no proper function" (*Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 383 [1977], *cert denied* 434 US 969 [1977] [citation omitted]).

In 1995, the Court of Appeals revisited the defamation by implication cause of action, noting that courts across the country have adopted different standards to balance these claims against the "concern that substantially truthful speech be adequately protected" (*Armstrong*, 85 NY2d at 381). However, the Court determined that the claim before it was not actually of implied defamation, but rather a more straightforward allegation of false statements of verifiable fact, and the question of the proper test for implied defamation claims remained open (*id.*).

The motion court adopted the approach taken by the court in *Biro v Condé Nast* (883 F Supp 2d 441, 463-467 [SD NY 2012]). That court, noting that neither the state nor federal appellate courts in New York had established a standard to be applied to a motion to dismiss a claim of defamatory implication, endorsed a rule articulated by several federal courts of appeals and already applied by at least one state trial court (*id.* at 464-465).

The D.C. Circuit Court of Appeals, relying in part on Eighth Circuit jurisprudence, determined:

> "[I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning" (*White v Fraternal Order of Police*, 909 F2d 512, 520 [DC Cir 1990]; *see Janklow v Newsweek, Inc.*, 759 F2d 644, 648-649 [8th Cir 1985], *cert denied* 479 US 883 [1986]).

The Fourth Circuit stated that this inquiry requires "an especially rigorous showing": the "language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference" (*Chapin v Knight-Ridder, Inc.*, 993 F2d 1087, 1093 [4th Cir 1993]). In a decision affirmed by this Court, the New York County Supreme Court quoted this *Chapin* standard before analyzing the plaintiff's implied defamation claims and dismissing the complaint (*Rappaport v VV Publ. Corp.*, 163 Misc 2d 1, 5-6 [Sup Ct, NY County 1994], *affd* 223 AD2d 515 [1st Dept 1996]).

Plaintiffs argue that we should instead adopt a standard, accepted by a number of other courts, that does not require showing that a defendant intended or endorsed a defamatory inference. They argue that because they are not public figures, who must show a statement was made with actual malice, they should not be held to show the author intended or endorsed a defamatory implication. In doing so, plaintiffs conflate two entirely separate issues. The "actual malice" rule requires a public figure to prove by clear and convincing evidence that a defamatory statement was published with "knowledge that it was false or with reckless disregard of whether it was false or not" (*Kipper v NYP Holdings Co., Inc.*, 12 NY3d 348, 353 [2009]). It is a subjective inquiry, "focusing upon the state of mind of the publisher of the allegedly libelous statements at the time of publication" (*id.* at 354-355). The standard at issue here is the threshold question of whether a statement is capable of a defamatory implication. "Whether particular words are defamatory presents a legal question to be resolved by the court in the first instance" (*Aronson v Wiersma*, 65 NY2d 592, 593 [1985]). It is not a test for fault and whether a particular plaintiff is a public or private figure is not relevant to the inquiry. Furthermore, it is not a subjective standard like the "actual malice" test, but an objective one that asks whether the plain language of the communication itself suggests that an inference was intended or endorsed.

We adopt the standard advanced by defendant and accepted by the motion court. To survive a motion to dismiss a claim for defamation by implication where the factual statements at issue are substantially true, the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or

endorsed that inference. We believe this rule strikes the appropriate balance between a plaintiff's right to recover in tort for statements that defame by implication and a defendant's First Amendment protection for publishing substantially truthful statements (*see Armstrong*, 85 NY2d at 381).

Applying the standard to each of plaintiffs' allegations of implied defamation, we find that none of the article's statements meet this standard and affirm the motion court's dismissal of the complaint.

Plaintiffs argue that they were impliedly defamed when the article noted that employees of Midland Consult were directors of a shell company affiliated with Bristoll Export without clarifying that the 2008 wire transfer from Bristoll occurred before anyone connected to plaintiffs began serving as a director of any affiliate of Bristoll. We do not agree that the minor omission of the timeline of Bristoll's involvement with Midland raises an implication that Midland was connected to the scheme described in the article. Nor do we agree that if the timeline had been included, it would have "revealed to the editors that [plaintiffs] had no place in the narrative." Plaintiffs misapprehend the clear purpose of this small passage in the context of the entire article.

Before describing the various transactions borne out in the Credit Suisse records, of which the Bristoll transaction was one, the article cited a money-laundering compliance expert who explained that a bank's obligation to report suspicions of money laundering arises from a confluence of factors including not only the use of offshore shells to hide income and assets, but also high-risk jurisdictions, a lack of legitimate commercial activity, and politically connected individuals. The article claims that Hermitage's Swiss complaint points out all these factors, then goes on to describe each transaction and its associated risk factors. Viewed in this context, it is clear that the only implication intended or endorsed by the author is that the Bristoll wire transfer qualifies as a suspicious transaction. The article first links Bristoll to GT Group and states that other shell companies associated with GT were involved in unrelated illegal actions, or "a lack of legitimate commercial activity." Indeed, it is clear from the article that the GT Group's offices were not raided until over two and a half years after the unrelated Bristoll transfer, but the author still included the information, and it clearly promotes an inference that at least one of the risk factors existed.

■ The article then connects Bristoll to Midland and, while the connection is attenuated, it has been established that it is substantially true. The article also states the true facts that plaintiff Stepanov is a former Russian diplomat and that plaintiff Midland was founded in Cyprus. These facts lead to an inference that Bristoll was at some point associated with two more risk factors, "politically connected individuals" and "high-risk jurisdictions." As the article did in its statements regarding GT Group, it could have more clearly stated the timeline of Bristoll's involvement with Midland, but this would not have made the involvement irrelevant, because the intended or endorsed implication, and the entire import, of this connection was clearly not to show that Midland was involved in the Bristoll transaction or the tax-fraud scheme, but rather to show that Bristoll satisfied the money-laundering risk factors and it should have been reported to regulators.

Plaintiffs also contend they were defamed by an implication that they were involved in the illegal actions perpetrated by other shell companies formed by GT Group because the article did not note that plaintiffs had severed ties with GT before the activities occurred. Again, the clear implication intended by the mention of these illegal activities was to show that the Bristoll transaction was suspicious. It cannot reasonably be read to imply that plaintiffs were somehow involved in the schemes to launder Mexican drug cartel money or transport North Korean weapons.

■ Plaintiffs reiterate their contention that identifying Maxim Stepanov as a "former Russian diplomat" implied that he was involved in the corrupt activities because the article did not clarify that he left office before Putin's presidency. As discussed above, there is no reasonable reading of this true fact that can lend itself to a defamatory implication. The article does not allege any corruption at all in Russia's diplomatic corps and does not imply that plaintiff Stepanov himself was involved in any corruption.

Finally, plaintiffs argue that the article implies that Maxim Stepanov was somehow involved in the scheme because it expressly states that Olga Stepanova and her husband Vladlen Stepanov were central to the fraud without clarifying that they had no connection to Maxim. There is simply no reasonable reading of the article that imparts this inference. The lone fact that they share a last name that plaintiffs' counsel has conceded is very common in Russia, comparable to "Smith" in the United

States, is far too attenuated to support a reasonable implication that Maxim was not only related to Olga and Vladlen but somehow involved in their fraudulent activities.

Given that we conclude that nothing is expressed or implied in defendant's article that is capable of a defamatory meaning as it pertains to plaintiffs, the complaint was properly dismissed. We, therefore, need not address defendant's alternative argument that the content of the article is privileged as a fair report of an official proceeding under Civil Rights Law § 74.

Accordingly, the order of the Supreme Court, New York County (Ellen M. Coin, J.), entered April 19, 2013, which granted defendant's motion to dismiss the complaint should be affirmed, with costs.

ACOSTA, J.P., SAXE, MOSKOWITZ and MANZANET-DANIELS, JJ., concur.

Order, Supreme Court, New York County, entered April 19, 2013, affirmed, with costs.