# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 45530

| | | |
|---|---|---|
| JAMES VERITY and SARAHNA VERITY, husband and wife, | ) ) ) ) | |
| Plaintiffs-Respondents, | ) ) | Boise, September 2018 Term |
| v. | ) ) | Filed: March 4, 2019 |
| USA TODAY, a division of Gannett Satellite Information Network, LLC, a Delaware limited liability company; KTVB, a division of King Broadcasting Company, a Washington corporation; KGW, a division of Sander Operating Co. III, LLC, a Delaware limited liability company; TAMI TREMBLAY, an individual; STEPHEN REILLY, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Karel A. Lehrman, Clerk |
| Defendants-Appellants, and | ) ) ) | |
| JOHN / JANE DOES. | ) ) | |
| Defendants. | ) ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Melissa Moody, District Judge.

The decision of the district court as to Verity not being a public official or public figure is <u>affirmed</u>. The district court's conclusion that a reasonable jury could find that KGW impliedly defamed Verity about having a sexual relationship with a minor is <u>affirmed</u>. The district court's rulings on all remaining claims are <u>reversed</u> and this case is <u>remanded</u> for further action consistent with this Opinion.

Givens Pursley LLP, Boise, attorneys for Appellants. Debora K. Kristensen argued.

Shep Law Group, Meridian, attorneys for Respondents. Ronald Shepherd argued.

Charles A. Brown, Lewiston, and Ballard Spahr LLP, Washington D.C., attorneys for *amici curiae*.

BEVAN, Justice

## I. NATURE OF THE CASE

This is a permissive appeal that presents a case of first impression regarding whether the tort of defamation by implication exists in Idaho. Respondent James Verity was a school teacher in Oregon who lost his teaching license after engaging in an inappropriate relationship with an eighteen-year-old female student, whom he coached at the local high school. He eventually obtained a teaching license in Idaho, and began teaching shortly thereafter. When he was forced to resign his teaching job in Idaho after USA TODAY, KTVB, KGW, Tami Tremblay, and Stephen Reilly published articles and broadcast news reports describing Verity's misdeeds, he and his wife Sarahna Verity filed a lawsuit alleging defamation by implication. The district court denied the media's motion for summary judgment and ruled that despite the actual truth of the statements, reasonable minds could find that the media impliedly defamed the Veritys. The media now appeals that decision as a permissive appeal under Idaho Appellate Rule 12.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Verity's History in Oregon and Idaho.

From 1998 until 2005, both James Verity and his wife Sarahna Verity (the "Veritys") held teaching positions with the Crook County School District in Prineville, Oregon. Mr. Verity taught middle school and coached several sports for the district, including varsity girls basketball and varsity girls softball at the high school. Ms. Verity taught physical education at the elementary school.

Sometime around spring of 2005, Verity began an inappropriate relationship with an eighteen-year-old female student whom he coached and used as a tutor for his middle school science class. Spanning over four months, the relationship involved approximately 2,625 text messages and over 500 hours of telephone conversations between Verity and the student, several of which occurred between the hours of 10:00 p.m. and 6:00 a.m. Notes were also exchanged. Eventually, the relationship escalated into inappropriate physical contact. Despite the sexual nature of the contact, there is no evidence that Verity and the student engaged in sexual intercourse.

In May of 2005, Crook County school officials learned of the relationship between Verity and the student. School officials contacted local law enforcement and an investigation ensued. Verity was placed on administrative leave from the school on May 26, 2005, while the school

2

district completed its investigation. On July 11, a settlement agreement was reached, under which Verity would resign from his teaching position and the school district would inform the Oregon Teaching Standards and Practices Commission of Verity's resignation and the reasons behind it. Over the next year, the Oregon Commission investigated the matter for itself and on August 4th, 2006, it revoked Verity's Oregon teaching license. According to the revocation order, Verity could apply for the reinstatement of his license after one year, provided certain conditions were met.

A year later, Verity applied for reinstatement. Verity submitted two psychological evaluations with his application: one by James R. Hamer, MS, and the other by Dr. Michelle Whitehead. While Hamer concluded that Verity could return to teaching if he remained in counseling, Dr. Whitehead disagreed. Dr. Whitehead concluded that Verity should not be left alone with any female student over the age of 12 to avoid any misunderstanding on the part of female students. Citing Dr. Whitehead's evaluation, the Oregon commission declined to reinstate Verity's teaching license after a vote at a meeting in February 2008.

In March 2008, Verity applied for an Idaho teaching license. In his application, Verity disclosed to Idaho officials that his Oregon license had been revoked. On June 12, 2008, the Chief Certification Officer for Idaho's Department of Education, Christina Linder, denied Verity's application for an Idaho teaching license, based on Verity's conduct in Oregon and a discussion among the members of the Ethics Committee. Verity appealed this initial denial to the Idaho Department of Education's Professional Standards Commission ("Idaho Commission") and a hearing to review the denial was set for September 30, 2008.

Prior to the hearing, Verity obtained counseling from Dr. Scott Miller, a licensed psychologist whom Dr. Whitehead had approved to treat Verity. Dr. Miller concluded that there was no reason to believe Verity was at risk of ever "cross[ing] the line with a student of any age again." Dr. Miller's report was included with Verity's appeal and the Idaho Commission reversed the Chief Certification Officer's denial of Verity's Idaho license application. In July 2009, Verity was issued an Idaho teaching license. In September 2010, Verity applied and was offered a position at the Caldwell School District in Idaho to teach physical science. Amid some accusations of inappropriate behavior (hitting students with rulers and making violent comments) and after receiving a poor teaching evaluation, Verity sought alternative employment with Vallivue School District in March 2013. Verity was employed with Vallivue School District, at

3

Sage Valley Middle School, from 2014 until February 2016, when he resigned after the publication of various news articles and television broadcasts describing his conduct in Oregon and his subsequent move to Idaho to teach.

**B. The Allegedly Defamatory Articles and Broadcasts.**

Appellants are USA Today; Stephen Reilly, an investigative reporter and data specialist with USA Today; KGW, a Portland, Oregon news station; KTVB, a Boise news station; and Tami Tremblay, an investigative reporter, anchorperson, and producer with KTVB (collectively referred to as the "Media Defendants").

The original KGW broadcast in question aired on February 15, 2016, as part of a larger investigation into how states track teacher disciplinary matters. During a broadcast titled, "The Dishonor Roll," reporter Kyle Iboshi stated:

> Jim Verity was a middle school teacher and high school girls' softball coach in Prineville, Oregon, but, in 2005, school administrators learned Verity had exchanged thousands of text messages, many of them late at night, with a female student. State teacher discipline records show Verity and the female student developed a sexual relationship.
> …
> Oregon revoked Verity's teaching license. When he tried to re-apply several years later, a psychiatrist recommended he "not be left alone with any female student over the age of 12 in order to protect [Verity] and the student."
> …
> But the very next year Verity was back in the classroom. This time 300 miles away across state lines near Boise, Idaho. And today, he's still teaching. Our investigation found Verity's case is not an isolated example.

During the moments Verity's relationship with the female student was discussed, the background image on the screen displayed a copy of the Oregon Commissioner's Order Denying License Reinstatement, with the text of the order entirely blurred out except for the words "a sexual relationship with a student."

KGW also posted on its website a version of a USA Today article, authored by Stephen Reilly, entitled

> Broken Systems Let Teachers Flee Troubled Pasts: An investigation found fundamental defects in the teacher screening systems used to ensure the safety of children in the nation's more than 13,000 school districts.

That article stated the following:

> [In 2005] school administrators learned that Verity had been exchanging text messages and phone calls with a female student. Discipline records [ ] show the

4

state revoked Verity's license after officials found he engaged in physical contact with the student, including "kissing on the lips, neck and earlobe, grinding his pelvis into her pelvic area and touching her breasts and groin area."

When he tried to re-apply for a teaching license in 2009, a psychiatrist evaluating Verity recommended that he "not be left alone with any female student over the age of 12 in order to protect Mr. Verity and the student."

…

The Oregon Teacher Standards and Practices Commission denied Verity's application to reinstate his teaching license.

After the denial, records show Verity moved to Idaho where he was granted a teaching license. He worked in the Caldwell School District from 2010 to 2014. Superintendent Jodie Mills told USA Today the district was never made aware his license was revoked in Oregon. She said the revocation would "absolutely" have been a concern had it come to the district's attention.

Since 2014, Verity has taught sixth grade science at Sage Valley Middle School in the Vallivue School District, which is outside Boise. Vallivue superintendent Pat Charlton said Verity "disclosed to his building principal that there had been an incident involving an 18-year-old female, eight years earlier, but no charges had been filed."

Finally, on February 22, 2016, KTVB broadcast a report similar in content to KGW's broadcast; however, in the KTVB broadcast, the reporter stated that

[i]n 2005, school administrators learned Verity had exchanged thousands of text messages, many of them late at night, with an 18-year-old female student. Discipline records for Oregon teachers show they developed a sexual relationship.

…

We found 9,000 disciplined teachers nationwide missing from the [National Association of State Directors of Teacher Education and Certification] database, including Mr. Verity, who worked for the Caldwell School District from 2010 to 2011 and from 2013 to 2014. The Superintendent there, Jodie Mills, tells us they had no idea about Verity's past record. Verity started working in the Vallivue School District in 2014. He still teaches sixth grade science at Sage Valley.

Verity's superintendent, Pat Charlton of Vallivue School District told [KTVB] "Verity's background checks came back clean, and he had positive recommendations." Charlton also says, "Verity told his principal at Sage Valley about his disciplinary action in Oregon." He says, "Because criminal charges were never filed, since the student was 18, they chose to keep Verity in the classroom."

Thus, KTVB's report varied importantly in that it discussed the fact that the female student was 18 and also discussed the knowledge on the part of the superintendent about Verity's past. *Id.*

All the Appellants shared information about both the broadcast and written stories. After the stories were broadcast and/or published, Vallivue School District began receiving email communications from concerned citizens regarding Verity and his continued employment at the school. On February 22, 2016, Verity resigned his position and entered into a separation agreement with Vallivue School District. Verity also alleges that he was no longer allowed to coach his son's youth baseball league and was rejected from other coaching positions after the articles were published.

After the initial articles were printed, USA Today published articles entitled "Former Oregon teacher resigns after sexual misconduct revealed" and "Third Teacher Forced Out By Probe," both discussing Verity's resignation after "past misconduct was brought to light by the USA Today Network investigation."

## C. Course of Proceedings.

On March 28, 2016, the Veritys sued the Appellants for defamation, false light invasion of privacy, and negligent and intentional infliction of emotional distress. At the close of discovery, Appellants moved for summary judgment. In October 2017, the district court granted in part and denied in part the Appellants' motion for summary judgment. The district court held that to survive summary judgment in a case such as this, a plaintiff who is a public official or public figure must show (1) that a defamatory implication can be reasonably drawn from the true statements in question; (2) appellants intended to convey that implication; (3) the implication was false; and (4) the statements were made with actual malice. If the plaintiff is determined not to be a public figure, the court reasoned that the plaintiff must prove "only that Defendants were negligent regarding the falsity of the implications they conveyed."

Based on that general framework, the district court found: (1) Verity was not a public figure or public official and therefore he need not establish that the Appellants' implications were made with actual malice; and (2) a reasonable jury could conclude that the Appellants' publications intentionally implied three false assertions alleged by Verity. The three impliedly false assertions were that Verity (a) was a danger to female students; (b) deceived Idaho officials by hiding his past conduct; and (c) committed a crime by having sex with a minor. Thus, the district court concluded there were issues of material fact as to these false assertions precluded summary judgment.

6

On October 31, 2017, Appellants filed a motion for permission to appeal under Idaho Appellate Rule 12. The district court granted partial immediate appellate review for only one question of law: whether school teachers are public officials for the purposes of First Amendment analysis. Shortly thereafter Appellants filed a motion for permission to appeal with this Court under the same Rule, which was granted on December 20, 2017. This Court's order accepting the permissive appeal limits the issues listed on appeal to those set forth below.

### III. ISSUES ON APPEAL

1. Whether, as a public school teacher and coach, Verity is a public official, requiring him to prove actual malice on the part of each Appellant.

2. Whether Idaho recognizes a cause of action for defamation by implication, and if so, what elements need to be shown to establish a successful claim?

3. If Idaho does recognize the tort of defamation by implication, what is the appropriate standard of proof?

4. Whether Appellants or the Veritys are entitled to an award of their reasonable attorney fees on appeal under Idaho Code Section 12-121.

### IV. STANDARD OF REVIEW

An order denying a motion for summary judgment is not itself an appealable order. *Aardema v. U.S. Dairy Systems, Inc.*, 147 Idaho 785, 789, 215 P.3d 505, 509 (2009). Yet permission may be granted by the Supreme Court to appeal from an action in the district court, which would not otherwise be appealable. *Id.*; I.A.R. 12. To qualify for a permissive appeal under Idaho Appellate Rule 12, the issue must involve a "controlling question of law as to which there is substantial grounds for difference of opinion." I.A.R. 12.

The intent of Idaho Appellate Rule 12 is "'to provide an immediate appeal from an interlocutory order if substantial legal issues of great public interest or legal questions of first impression are involved.'" *Aardema*, 147 Idaho at 789, 215 P.3d at 509 (quoting *Budell v. Todd*, 105 Idaho 2, 4, 665 P.2d 701, 703 (1983) (per curiam)). Because of the "unusual posture" presented by a permissive appeal under Rule 12, this Court is "constrained to rule narrowly and address only the precise question[s] that w[ere] framed by the motion and answered by the trial court." *Winn v. Frasher*, 116 Idaho 500, 501, 777 P.2d 722, 723 (1989).

When reviewing an order for summary judgment, the standard of review used by this Court is the same as that used by the district court in ruling on the motion. *Van v. Portneuf Medical Center*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009). All facts and inferences must be

drawn in favor of the nonmoving party, and summary judgment is proper only when there is no genuine issue of material fact, entitling the moving party to judgment as a matter of law. *Aardema*, 147 Idaho at 789, 215 P.3d at 509.

## V. ANALYSIS

Traditionally, a defamation action allows a plaintiff to recover for a defendant's false statements that harm the plaintiff's reputation. To prevail on a defamation claim in Idaho, a plaintiff must prove that the defendant: (1) communicated information concerning the plaintiff to others; (2) the information was defamatory; and (3) the plaintiff was damaged because of the communication. *Clark v. The Spokesman-Review*, 144 Idaho 427, 430, 163 P.3d 216, 219 (2007). If the plaintiff is a public figure or public official, he cannot recover for a defamatory falsehood unless he proves that the statement was made with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). Actual malice requires a subjective inquiry into the state of mind of the publisher where the plaintiff must show that the defendant had knowledge of the falsehood or acted with reckless disregard as to whether it was false or not. *Id.*

Sometimes a communication will not be defamatory on its face, constituting express defamation, but through context, omission, or other rhetorical devices, a defamatory implication might arise. This tort is known as implied defamation or defamation by implication. *See* Julia M. Capie, *Freedom of Unspoken Speech: Implied Defamation and its Constitutional Limitations*, 31 TOURO L. REV. 675, 681 (2015); *see also* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on the Law of Torts* § 116, at 117 (5th ed. Supp. 1988) ("Defamation by implication arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication.…"); *see also Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007).

## A.   Verity, as a public school teacher and coach, is not a public figure or official.

Determining whether an individual is a public figure or official presents a question of law. *Clark*, 144 Idaho at 430, 163 P.3d at 219. This question is important because a person's status as a public figure or public official sets the bar for the nature and level of proof required to make a case for defamation. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343 (1974). As noted correctly by the district court, if a plaintiff bringing a cause of action for defamation by implication is a public official or public figure, the plaintiff must prove malice to state a

sustainable claim. Public officials are viewed to be voluntarily active in the rough-and-tumble arena of public debate, and therefore they are not entitled to the same legal protection in "preventing and redressing attacks on reputation," *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966), that ordinary citizens receive. *See also Gertz,* 418 U.S. at 334 (citing *New York Times Co.*, 376 U.S. at 254 (where the U.S. Supreme Court "established a constitutional privilege intended to free criticism of public officials from the restraints imposed by the common law of defamation.").

The "constitutional privilege" comes into play when a person holds a position "among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id*. at 334, n. 6 (quoting *Rosenblatt*, 383 U.S. at 85). One's status as a public official is determined based on the principles laid out in *New York Times Co.*, 376 U.S. at 284, and later cases which identify the inherent conflict between the public's right to robust "debate on public issue[s] involving public figures," *see id*. at 270*,* and society's "pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt*, 383 U.S. at 86.

### 1. Public Official

States are split on whether public teachers qualify as public officials. *Compare Johnston v. Corinthian Television Corp.,* 583 P.2d 1101 (Okla. 1978) (holding a middle school teacher to be a public official) with *Nodar v. Galbreath*, 462 So. 2d 803 (Fla. 1984) (declining to hold that a teacher in a public high school is a public official). The United States Supreme Court has yet to weigh-in on this issue and this is a matter of first impression for this Court. We hold that in Idaho a public teacher working in a teaching capacity will rarely, if ever, qualify as a public official.

Although it is true that as a public school teacher, Verity is a government employee, he did not attempt to control public policy or opinion, nor did he act in any capacity with the equivalent authority of a public official. Appellants claim that as a teacher Verity holds a position of such public importance that his public employee status coupled with the deeds set forth in the publications or broadcasts should alone qualify him as a public official. We disagree, and hold that employee status is insufficient to transform a public employee into a public official – even if that public employee engages in conduct that is a matter of broad public concern.

It is true that a teacher's inappropriate relationship with a student is a matter of public concern, but that conduct does not elevate the teacher to the status of a figure who, "by reason of

9

the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." *Gertz*, 418 U.S. at 342. Verity did not hold a position of "persuasive power and influence" through his position as a teacher or a coach. *Id*. at 345. A schoolteacher or coach is not situated better than a private citizen to combat falsehoods. Verity lacked access to a bully pulpit and the USA Today article was published nationally, so any influence Verity could have had to defend his reputation as a public schoolteacher would be minuscule. *See id*. at 344 ("The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."). Verity had no access to a platform from which to defend himself. Finally, he was not a public office holder who "assumed an 'influential role in ordering society.'" *Id.* at 345 (internal citation omitted).

## 2. Public Figure

Designation as a public figure may rest on either of two alternative theories: (1) the individual has achieved "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts" or, more commonly (2) "an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351. "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society," the individual in question should not be considered a public figure for all aspects in his life. *Id.* at 352.

In *Wiemer v. Rankin*, this Court held that an individual was not a public figure based on two separate and applicable tests, both of which were gleaned from the U.S. Supreme Court. 117 Idaho 566, 570, 790 P.2d 347, 351 (1990). First, we applied a test much like the first *Gertz* test, where the determination was based on whether the person occupied a position of such persuasive power and influence that he should be seen as one of a small group of individuals who are public figures for all purposes. *Id.* (citing *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 165 (1979)). The second test we applied directly referenced *Gertz*, reasoning that a person is a public figure if he has "thrust himself 'to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Id.* (quoting *Gertz*, 418 U.S. at 345). We held that even if there may have been public controversy surrounding the defamatory statements in *Wiemer*, there

10

was no indication in the record that the plaintiff thrust himself to the forefront to influence the resolution of the issues involved in that case. 117 Idaho at 571, 790 P.2d at 352. The result is similar for Verity.

Verity is not a public figure as defined in *Wiemer*. He did not occupy "a position of such 'persuasive power and influence' that he could be deemed one of that small group of individuals who are public figures for all purposes." *Wiemer*, 117 Idaho at 570, 790 P.2d at 351 (quoting *Wolston*, 443 U.S. at 165). Nothing in the record here showed that Verity was a person who held this kind of influence. Verity also does not satisfy the second test provided by *Wiemer*. He did not "thrust himself to the forefront of [the public concern here] in order to influence the resolution of the issues involved." *Id.* (internal citation omitted). Thus, the district court did not err when it determined that Verity was not a public official or public figure.

**B.      Idaho recognizes defamation by implication.**

Appellants contend that this Court should not recognize the tort of defamation by implication for three reasons. First, because it deviates from longstanding precedent in Idaho which holds that true statements are not actionable. Second, holding publishers responsible for inferences made by a reader from truthful information would be incompatible with the First Amendment because such claims would inhibit the "robust discussion of public affairs" which the First Amendment promises. Third, Appellants claim that the ruling of the district court— which recognized defamation by implication—was infirm because it identified such a claim based on facts which the Appellants allegedly omitted in their statements. Appellants contend that even if defamation by implication is a recognizable cause of action, "merely omitting facts favorable to Mr. Verity or facts that Mr. Verity thinks should have been included" is insufficient to establish a cause of action for defamation by implication. This third argument goes to the merits of Verity's individual claims, an independent question we will discuss below.

The Veritys reply that defamation by implication is already a tort recognized in Idaho based on three grounds: (1) statutory law provides that common law will be followed in Idaho and the common law of England recognizes claims for defamation by implication; (2) this Court ruled that defamation by implication is actionable in this state in *Wiemer*; and (3) the U.S. Supreme Court and several other state courts have recognized the tort.

We agree with the second ground argued by the Veritys and find it sufficient to resolve this issue. We hold that this Court recognized the tort of defamation by implication in *Wiemer*,

11

and we confirm that such a tort is actionable in Idaho, so long as the parameters set forth below are met. In *Wiemer*, the husband of a wife who died of a gunshot wound filed a defamation suit against the publisher of an article over the investigation surrounding the wife's death. 117 Idaho at 569, 790 P.2d at 350. The article implied, without stating, that the plaintiff (Irvin) had lied when he told the police that his wife (Debbie) had committed suicide. *Id.* at 568, 790 P.2d at 349. Irvin alleged

> that in the *context* of the article the portion about Debbie's death *was understood by the readers of the newspaper to have this [defamatory] meaning* and to indicate that Irvin was the one to which this portion of the article referred.

*Id.* at 569, 790 P.2d at 350 (emphasis added). Thus, the statements in the article, though true, were alleged to be defamatory by the way the facts were written and by what was understood by the reader. This Court interpreted the statements in the article "as *imputing* not only that Irvin lied about Debbie's committing suicide, but also that he killed Debbie." *Id.* at 570, 790 P.2d at 351 (emphasis added). This is a textbook example of defamation by implication. Thus, while this Court, in analyzing questions surrounding defamation stated that, "[u]nder the First Amendment there is no such thing as a false idea," *id.* at 571, 790 P.2d at 352, we recognized the principles supporting defamation by implication and analyzed whether actual malice had to be proven as part of such a claim. Ultimately Irvin's defamation claim was remanded for trial. *Id.* at 577, 790 P.2d 358.

### 1. The required elements to establish a claim for defamation by implication

Even acknowledging that defamation by implication has been recognized by this Court in *Wiemer*, we also understand that "[t]his case draws us into an area fraught with subtle complexities: the law of defamation by implication. A defamation by implication stems not from what is literally stated, but from what is implied." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990) ("*White II*"). Defined another way, "[d]efamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 42 (2014) (citation omitted). *Wiemer* did not expressly mention "defamation by implication" at all – and this Court did not define the required elements for this unique tort. Both parties here offer conflicting suggestions about what elements are required to establish a claim. The following analysis will seek to clarify the confusion.

12

"The torts of defamation and defamation by implication are more or less different sides of the same coin." *Hogan v. Winder*, 762 F.3d 1096, 1105 (10th Cir. 2014). In a defamation case in Idaho, "a plaintiff must prove that the defendant: (1) communicated information concerning the plaintiff to others; (2) that the information was defamatory; and (3) that the plaintiff was damaged because of the communication." *Clark v. The Spokesman-Review* 144 Idaho 427, 430, 163 P.3d 216, 219 (2007). "As a fourth element, when a publication concerns a public official, public figure, or matters of public concern and there is a media defendant, the plaintiff must also show the falsity of the statements at issue in order to prevail in a defamation suit." *Id*. A defamatory statement is one that "tends to harm a person's reputation, usually by subjecting the person to public contempt, disgrace, or ridicule, or by adversely affecting the person's business." *Elliott v. Murdock*, 161 Idaho 281, 287, 385 P.3d 459, 465 (2016) (citation omitted).

By our holding today we clarify that the definition[1] of *defamatory information* within the elements required by *Clark* and its progeny *includes* information which can be defamatory by implication. A plaintiff seeking to recover for defamation by implication must prove the elements of a defamation case to state a claim; the plaintiff may establish the *defamatory information* element by showing the falsity of the implication by pointing to false suggestions, impressions, or implications arising from otherwise truthful statements. *See West v. Thomson Newspapers*, 872 P.2d 999, 1011 (Utah 1994) (defamation by implication arises "from the statement and the context in which it was made, not the statement itself...."). Thus, we hold that defamation by implication arises, not from what is stated, but from what is implied when a defendant

> (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.

---

[1] Whether information is "defamatory" is not subject to exhaustive definition: "No exhaustive definition of 'defamatory' emerges from the cases for, as Lord Reid once said, it is not for the judges to 'frame definitions or to lay down hard and fast rules. It is their function to enunciate principles and much that they say is intended to be illustrative or explanatory and not to be definitive' [*Cassell & Co. Ltd. v. Broome* (1972) AC 1027, 1085]. One can nevertheless achieve a working description by combining two statements, namely: a defamatory statement is one which injures the reputation of another by exposing him to hatred, contempt, or ridicule, or which tends to lower him in the esteem of right-thinking members of society." R.W.M. Dias & B.S. Markesinis, *Tort Law* 423–24 (2d ed. 1989). BLACK'S LAW DICTIONARY, *Defamatory* (10th ed. 2014).

*Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on the Law of Torts* § 116, at 117 (5th ed. Supp. 1988). Our holding thus also modifies the "fourth element" from *Clark* in implied defamation cases. An implied defamation plaintiff need not prove the "falsity of the statements," but they must show the defamatory implication that arises from the context in which the statements were made. This exercise will require an inquiry into the case-specific context of the defamatory implication as a whole, rather than a focus on individual statements. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 635 (Tex. 2018). Questions that may help guide this inquiry include:

> Does the publication "clearly disclose[ ] the factual bases for" the statements it impliedly asserts? *See Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998). Does the allegedly defamatory implication align or conflict with the article's explicit statements? *See, e.g.*, *Wyo. Corp. Servs. v. CNBC, LLC*, 32 F.Supp.3d 1177, 1189 (D. Wyo. 2014). Does the publication accuse the plaintiff in a defamatory manner as opposed to simply reciting that others have accused the plaintiff of the same conduct? *See, e.g.*, *McIlvain*, 794 S.W.2d at 15. Does the publication report separate "sets of facts," or does it "link[ ] the key statements together"? *See, e.g.*, *Biro v. Conde Nast*, 883 F.Supp.2d 441, 467 (S.D.N.Y. 2012). And does the publication "specifically include[ ] facts that negate the implications that [the defendant] conjures up." *Deripaska v. Associated Press*, 282 F.Supp.3d 133, 148 (D.D.C. 2017), *appeal dismissed per stipulation*, No. 17-7164, 2017 WL 6553388 (D.C. Cir. Dec. 8, 2017).

*Id.*

The D.C. Circuit provided a detailed analysis of a defamation by implication case in *White II*. The court held that one of several letters in question was reasonably capable of a defamatory meaning because it went "beyond merely reporting materially true facts" and provided "a clear signal from which a reader could conclude . . . that the defamatory meaning was intended or endorsed." 909 F.2d at 521. Having so ruled, the court set forth a relevant framework for evaluating these claims which we adopt:

> [I]f a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established. But if the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference, the communication will be deemed capable of bearing that meaning.

14

*Id.* at 520 (emphasis in original); *see also Dallas Morning News,* 554 S.W.3d at 635; *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993); *Vinas v. Chubb Corp.*, 499 F.Supp.2d 427, 437 (S.D.N.Y. 2007).

Thus, the appropriate threshold inquiry is (1) whether the publication is reasonably capable of bearing a defamatory implication, followed by (2) an analysis of whether affirmative evidence suggests that the defendant intends or endorses a defamatory meaning. *White II*, 909 F.2d at 520. The requisite proof also requires the plaintiff to show, as advocated by Appellants, that the defendant intended or endorsed the defamatory inference.

The New York Supreme Court's Appellate Division articulated a similar standard that "struck the appropriate balance" between a "plaintiff's right to recover in tort for statements that defame by implication and a defendant's First Amendment protection for publishing substantially truthful statements." *Stepanov*, 987 N.Y.S.2d at 44. The court there held that a plaintiff in a defamation by implication case

> *must make a rigorous showing* that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference.

*Id.* (emphasis added). We likewise agree that the appropriate balance is achieved between defamation by implication plaintiffs and a defendant's First Amendment protection by requiring the plaintiff to make this "rigorous showing" about the false implications alleged and the defendant's intent or endorsement of that falsity. The language must (1) be reasonably understood to impart the false innuendo, and (2) affirmatively suggest that the author intends or endorses the inference. *Chapin*, 993 F.2d at 1110. This showing is a rigorous one because it necessarily requires proof regarding these two showings.

Appellants argue that this holding contradicts a black-letter principle of Idaho law that true or substantially true statements cannot support a claim for defamation, and that truth is a complete defense to a civil action for libel. *See Baker v. Burlington*, 99 Idaho 688, 690, 587 P.2d 829, 831 (1978). This principle remains good law; however, true statements that by context or as framed lead to a conclusion that the publisher intended or endorsed a defamatory meaning by the information published, are actionable. As noted, "where allegedly defamatory speech is of public concern, the First Amendment requires that the plaintiff, whether public official, public figure, or private individual, prove the statements at issue to be false." *Steele v. Spokesman-Review*, 138 Idaho 249, 252, 61 P.3d 606, 609 (2002) (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475

15

U.S. 767, 776 (1986) (Brennan, J., concurring)). This principle likewise remains valid – but again, if a plaintiff can prove that a false implication was made with the endorsement of the publisher, or with the intent to defame, even regarding a matter of public concern, the plaintiff can state a cause of action for defamation by implication.

In sum, in order to prove a claim of defamation by implication, the plaintiff has the burden of proving each of the following elements, by a preponderance of the evidence: (1) that the defendant communicated information about the plaintiff to others; (2) that the information, by implication or context, conveyed a false impression to those who heard the statement; (3) that the defendant intended or endorsed the false impression; (4) the plaintiff suffered actual damages because of the defamation; and (5) the amount of damages actually suffered by the plaintiff. With respect to the second element, the "gist" or "sting" of the communication, when taken in its entirety and in context must convey an impression that is materially different than the truth would have conveyed. *See*, *e.g.*, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on the Law of Torts* § 116, at 117 (5th ed. Supp. 1988) (stating that while defamation law shields publishers from liability for minor factual inaccuracies, "it also works in reverse, to impose liability upon the defendant who has the details right but the 'gist' wrong."); *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1107-08 n.12 (Fla. 2008) ("A statement is in some significant respect false if its substance or gist conveys a materially different meaning than the truth would have conveyed."). It is not sufficient to prove that some insignificant detail is false if the "gist" or sting" is otherwise true.

### 2. The proper standard of review for such a claim

Whether the meaning of a specific communication is defamatory is ordinarily a legal one for the court, but we take this opportunity to address the relative responsibilities of the judge and jury in a defamation case. These duties were articulated a century ago by the United States Supreme court in *Washington Post v. Chaloner*, 250 U.S. 290 (1919):

> A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.... When thus read, if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If, upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.

16

*Id*. at 293 (quoting *Commercial Pub. Co. v. Smith*, 149 F. 704, 706–07 (6th Cir. 1907)).

Thus, the initial issue calls for a legal determination for the court to make; that is, whether a statement is capable of defamatory meaning. *See Hogan v. Winder*, 762 F.3d 1096 (10th Cir. 2014) (whether a statement is capable of a defamatory meaning is a question of law). "As a threshold matter, therefore, the Court must find that an allegedly defamatory statement is capable of bearing at least one defamatory meaning before submitting to the jury the question of whether the statement was understood to have the defamatory meaning." *White v. Fraternal Order of Police*, 707 F. Supp. 579, 588 (D.C. 1989) ("*White I*"). Once the threshold inquiry of whether the statement is capable of a defamatory meaning has been resolved in the affirmative, the case must be submitted to a jury. The jury will then determine whether the statement was understood to contain the defamatory meaning alleged, and whether the statement's publisher intended or endorsed the statement to have that effect.

## C.     The appropriate standard of proof.

The appropriate standard of proof required for a plaintiff to establish these four elements remains at issue. Since such claims "by nature present ambiguous evidence with respect to falsity," *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 129 (Mich. 1991), we agree with the perspective of the New York Supreme Court in *Stepanov*, as originally explained by the Fourth Circuit that, because of the constitutional hurdles these claims present, such plaintiffs must make an "especially rigorous showing." *Stepanov*, 987 N.Y.S.2d at 43 (quoting *Chapin*, 933 F.2d at 1093). As noted above, this requires a rigorous showing by the plaintiff that "[t]he language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author *intends or endorses* the *inference*." *Id*. (citing *White II*, 909 F.2d at 520) (emphasis in original).

We conclude that the "especially rigorous showing" involves the proof a plaintiff must offer, not only as to the falsity implied by the language, but also as to the intent held by the language's author. With that said, a rigorous showing does not amount to an elevation of the burden of proof upon the plaintiff. Defamation by implication remains a tort, and when alleged by an ordinary citizen, that citizen need not make an elevated showing by clear and convincing

17

evidence that the five elements of a claim are met. Rather, the plaintiff must show by a preponderance of the evidence[2] that the elements listed above have been met.

**D.      Application of this standard to the facts here.**

Since our standard of review here is de novo, we will, in the interest of judicial economy, analyze the district court's conclusions given this standard. In doing so, we hold that insufficient objective proof shows that USA Today, KTVB, or either of its employees intended or endorsed any of the three defamatory inferences which the district court found were sufficient to go to trial.

As for the first alleged defamatory implication, that Verity was a danger to female students, USA Today, KTVB, and their employees were specific in stating that a psychologist recommended that Verity not be left alone with female students over the age of twelve, *both for his protection and the potential students*. Applying the *Dallas Morning News*' question of "does the publication "specifically include[ ] facts that negate the implications that [the defendant] conjures up," *id*., all of these defendants' reports or broadcasts specifically included salient facts that (1) the recommendation came from a psychologist; and (2) that the recommendation was not just for the students, but for the protection of Verity himself. It is difficult to say that the statement that Verity might have been a danger, based on the psychologist's opinion, even creates a false implication; however, even if it were found to establish an untrue implication, it specifically relies upon the report of Dr. Whitehead. These defendants simply reported that a psychologist made the finding that he should not be alone with female students.

As for the second alleged defamatory implication, that Verity committed a crime by having sex with a minor, neither USA Today nor its author created this implication. In its article, it expressly stated that the female student was 18 and explicitly described the conduct in which Verity was found to have engaged with the student. Based on these facts, as a matter of law, there cannot be a finding that the information, by implication or context, conveyed a defamatory impression. The KTVB broadcast is closer to the line. Verity's complaint alleged that KTVB and its reporter implied he "had sexual intercourse with one of his students who was not of adult age." Even so, the broadcast specifically states that the student was 18, although it never

---

[2] The United States Supreme Court left to the states to establish the appropriate standard of liability for a publisher or broadcaster of defamatory materials. *See Gertz,* 418 U.S. at 347 ("We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.")

18

describes the accused conduct and in fact, goes so far as to display a blurred out copy of the report denying license reinstatement to Verity with only the words "a sexual relationship" legible. Given that once again these "specifically included facts" negate the implications alleged, Verity's claim against KTVB and its reporter fails.

Finally, with respect to the third defamatory implication alleged by Verity, that he deceived Idaho officials by hiding his past, again, as a matter of law, Verity's claims against USA Today and KTVB fail to meet the now adopted standard for defamation by implication. Both articles/broadcasts focus blame on state reporting systems and the national database for the fact that Verity could obtain an Idaho license after his Oregon license was revoked. Also, the KTVB broadcast unambiguously stated that Verity told his principal about his actions in Oregon.

For the above reasons, USA Today, Stephen Reilly, KTVB, and Tami Tremblay cannot be held to have "accuse[d] the plaintiff in a defamatory manner as opposed to simply reciting that others have accused the plaintiff of the same conduct." *Id*. The allegations against these four defendants are therefore to be dismissed.

The result for KGW is different as to one claim. KGW, in collaboration with the other two networks, broadcast a similar, yet less descriptive version of events. Even so, for the same reasons we have stated above for the other four defendants, the statements made in KGW's broadcast do not rise to the rigorous showing required to support the claim that KGW intended or endorsed that Verity was a danger to female students or that he deceived Idaho officials by hiding his past conduct. With that said, we find that the district court was correct when it stated that "a jury could conclude that the KGW broadcast implies that [ ] Verity engaged in criminal conduct by having sex with a minor." KGW aired statements that Verity had a "sexual relationship with a student," and that he had been disciplined for it. Simultaneously, the broadcast displayed the same blurred copy of Verity's Oregon license denial that KTVB showed, with the text entirely illegible, except for the words "a sexual relationship." KGW never mentioned the student was 18, nor did it clarify the nature of the sexual contact. Viewing these statements against the threshold inquiry [of] whether the publication is reasonably capable of bearing a defamatory implication followed by an analysis of whether the implication is defamatory, we conclude that this claim satisfies these criteria. *See White II*, 909 F.2d at 520. The nature of the broadcast and its context also plays into this conclusion, leaving for a jury to

19

consider whether KGW intended or endorsed the idea that Verity committed a sexual crime against a minor.

**E.      Neither party is entitled to an award of attorney fees or costs on appeal.**

Both parties request an award of their reasonable attorney fees and costs on appeal pursuant to Idaho Code Section 12-121. However, since Appellants and Verity "both prevail in part on appeal, attorney fees on appeal are improper." *City of Middleton v. Coleman Homes, LLC*, 163 Idaho 716, 732, 418 P.3d 1225, 1241 (2018). Neither party is entitled to an award of attorney fees or costs.

## VI. CONCLUSION

For all these reasons, this Court affirms the district court's conclusion that Verity is not a public official or a public figure. We also affirm the district court's conclusion that a reasonable jury could find that KGW impliedly defamed Verity about his having a sexual relationship with a minor. We reverse the district court on all of Verity's remaining claims for reasons stated in this Opinion. We remand for the district court to act consistently with this Opinion.

Chief Justice BURDICK, Justices BRODY, STEGNER and HORTON, CONCUR.